## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

|  |  |  |
|---|---|---|
| | : | |
| GAIL WATSON CHIANG, et al. | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO.:  2000-04 |
| | : | |
| ED SCHAFER[1], | : | |
| Secretary of United States Department of | : | |
| Agriculture, | : | |
| Defendant. | : | |

### MEMORANDUM

Giles, J.                                                                    August 20, 2008

### I.    INTRODUCTION

Plaintiffs, a class of individuals currently or previously residing in the Territory of the

United States Virgin Islands,[2] bring this class action against Ed Schafer, Secretary of the United

States Department of Agriculture (USDA), alleging, in part, national origin discrimination in

administration of federal rural housing loan programs and monies.  Plaintiffs allege that as Virgin

Islanders, they were discriminated against on the basis of their national origin, and that such

discrimination is in violation of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691 et

seq.  In addition, Plaintiffs allege violations of the Fair Housing Act (FHA), 42 U.S.C. §§ 3601 et

seq., and the Administrative Procedures Act (APA), 5 U.S.C. §§ 551 et seq.  There are over two

---

[1] On January 28, 2008, Ed Schafer became the current Secretary of the United States Department of Agriculture and, pursuant to Fed. R. Civ. P. 25(a)(1), should be substituted for former Secretary Anne M. Veneman as the official Defendant in this matter.

[2] References to the Virgin Islands in this Memorandum are references only to the United States Virgin Islands, which includes the islands of St. Thomas, St. John and St. Croix.

thousand class members.  There has been extensive discovery and motion practice.  Presently

before the court are cross-motions for summary judgment, as well as Defendant's Motion to

Define the National Origin Designation of Virgin Islander ("Motion to Define Virgin Islander").

Given the length of the Memorandum, the court gives a short preamble and summary for

the convenience of the non-legal reader.  Under the undisputed evidence, the class definition, as

insisted upon by Plaintiffs, presents an insurmountable legal barrier to any possible finding of

intentional national origin discrimination with respect to Counts I through III.  It is undisputed

that all allocated funds for the Virgin Islands RD programs were distributed to Virgin Islanders

and that it was distributed according to an established statutory formula, with there being no

distinction between states and territories.  It is also undisputed that in all but four years in the

relevant period, monies allocated to the Virgin Islands were used to support loans or grants to

Virgin Islanders.  In those four years, all of the funds that were expended were utilized for the

benefit of Virgin Islanders.

Unexpended money was returned from the Virgin Islands and states to the National Rural

Development Office and, pursuant to the statutory formula, was redistributed to the Virgin

Islands and states.  One hundred percent of USDA funds expended in the Virgin Islands were

expended for the benefit of Virgin Islanders.  There is no evidence that expended funds were

used for non-Virgin Islanders in the Virgin Islands.  No distinction is or can be made within the

class of Virgin Islanders based upon race, sex, skin color, island of origin, language, native

citizenship or naturalized citizenship.

The amount of money allocated for housing loans under the applicable programs was

limited.  Eligibility to receive loans had to satisfy stringent regulatory criteria.[3]  These criteria were subject to change from year to year.  Even if in any year all members of the class were eligible, not all class members could have received loans.  There is an inherent tension within the class as defined because class members were competitors for very limited resources in every funding year.

For the reasons detailed below, the court finds that Plaintiffs have produced no evidence in response to the Defendant's Motion for Summary Judgment that raises any reasonable inference of intentional national origin discrimination.  In addition, the court finds that Plaintiffs cannot establish that they are entitled to summary judgment on Count I.  Defendant's Motion for Summary Judgment is granted, Defendant's Motion to Define Virgin Islander is denied and Plaintiffs' Motion for Summary Judgment is denied.

## II.   PROCEDURAL HISTORY

Plaintiffs initiated this case on January 10, 2000 by filing a complaint in the District Court of the Virgin Islands, Division of St. Croix.  (Docket No. 1).  An Amended Complaint was filed on March 23, 2000.  (Docket No. 16.)  Defendant filed a Motion to Dismiss on October 30, 2000.  (Docket No. 24).  A motions hearing was held before District Judge Thomas K. Moore on February 23, 2001.  The court granted Defendant's motion in part, and ordered Plaintiffs to submit an amended complaint.  (Docket No. 35).

A First Amended Class Action Complaint ("First Amended Complaint") followed on

---

[3] One of the criterion was that, for persons qualified for a building loan, the otherwise eligible applicant had to obtain a contractor who would do the necessary work pursuant to uniform USDA regulations as to material quality.

March 23, 2001 (Docket No. 39), alleging unlawful discrimination on the basis of race, gender

and national origin.  Defendant filed a Motion to Dismiss this First Amended Complaint.  A

motions hearing was held before District Judge Moore on January 25, 2002, during which the

court made certain record rulings as to the motion to dismiss.  The court denied Defendant's

motion to dismiss but required Plaintiffs to file a more definite statement of Count VI, in which

Plaintiffs allege a constitutional equal protection violation.  (Oral Arg. Tr. 59-63, Jan. 25, 2002.)

Plaintiffs filed a Motion for Class Certification on March 1, 2002 (Docket No. 69), which

Defendant opposed (Docket No. 75).  The district court granted Plaintiffs' class certification

motion and certified the following class under Fed. R. Civ. P. 23(b)(3):[4]

_____

[4] Rule 23 provides in pertinent part:

(a) Prerequisites to a Class Action.  One or more members of a
class may sue or be sued as representative parties on behalf of all
only if (1) the class is so numerous that joinder of all members is
impracticable, (2) there are questions of law or fact common to the
class, (3) the claims or defenses of the representative parties are
typical of the claims or defenses of the class, and (4) the
representative parties will fairly and adequately protect the interests
of the class.

(b) Class Actions Maintainable. An action may be maintained as a
class action if the prerequisites of subdivision (a) are satisfied, and
in addition:

. . .

(3)     the court finds that the questions of law or fact
common to the members of the class predominate
over any questions affecting only individual
members, and that a class action is superior to other
available methods for the fair and efficient
adjudication of the controversy.  The matters
pertinent to the findings include: (A) the interest of
members of the class in individually controlling the

> All persons who are Black, Hispanic, female and/or Virgin
> Islanders who applied or attempted to apply for, and/or received,
> housing credit, services, home ownership, assistance, training,
> and/or educational opportunities from the USDA through its Rural
> Development offices (and predecessor designations) located in the
> U.S. Virgin Islands at anytime between January 1, 1981 and
> January 10, 2000, and who believe they were discriminated against
> on the basis of race, gender or national origin.

Chiang v. Veneman, 213 F.R.D. 256 (D.V.I. 2003) ("Chiang I"), aff'd in part, vacated in part,

Chiang v. Veneman, 385 F.3d 256 (3d Cir. 2004) ("Chiang II").

Defendant appealed this class certification to the Court of Appeals for the Third Circuit

on July 22, 2003 (Docket No. 1694).  The Third Circuit partially affirmed the class certification

made by the district court, and reformed the class definition to include only the following:

> All Virgin Islanders who applied or attempted to apply for, and/or
> received, housing credit, services, home ownership, assistance,
> training and/or education opportunities from the USDA through its
> Rural Development offices (and predecessor designations) located
> in the U.S. Virgin Islands at any time between January 1, 1981 and
> January 10, 2000.

Chiang II, 385 F.3d at 274.  The Third Circuit specifically found that claims of racial and gender

discrimination together with claims of national origin discrimination presented an internal

contradiction in the class as certified by the district court.  Id. at 269.  Further, the Third Circuit

stated that "we reform the class definition based on our understanding of the main thrust of

---

prosecution or defense of separate actions; (B) the
extent and nature of any litigation concerning the
controversy already commenced by or against
members of the class; (C) the desirability or
undesirability of concentrating the litigation of the
claims in the particular forum; (D) the difficulties
likely to be encountered in the management of a
class action.

Fed. R. Civ. P. 23.

Chiang's claim, but we leave it open to the plaintiffs to seek to amend the class definition should they actually want to allege racial and gender, rather than national origin, discrimination." Id. Thereafter, Plaintiffs never sought to amend the class definition to allege racial and/or gender discrimination. Therefore, the reformed class definition in Chiang II is the binding definition of the class for all purposes.

Further, the Third Circuit only affirmed the class determination with respect to one issue: Defendant's alleged denial of housing loan applications to Virgin Islanders through the use of the waiting list and "associated techniques." The Third Circuit did not make any determination as to "whether eligibility for loans can be certified as a question suitable for class adjudication" and left this question, and others, for the district court's determination. Chiang II, 385 F.3d at 261.

Following the Third Circuit's certification of the class, the matter was managed by Magistrate Judge Geoffrey W. Barnard, and a mediator was appointed to work with the parties. The undersigned became assigned to the matter in November 2006. A status conference with counsel was held to establish a time line for completion of all discovery to accomplish the parties' objective of cross-motions for summary judgment.

On March 30, 2007, Plaintiffs filed their Motion for Summary Judgment (Docket No. 2475). Defendant filed its Motion for Summary Judgment (Docket No. 2477), as well as a Motion to Define Virgin Islander, on April 2, 2007.

On May 23, 2007, Plaintiffs filed a Motion under Fed. R. Civ. P. 56(f) (Docket No. 2508) requesting the denial or continuance of Defendant's summary judgment motion with respect to Counts IV and V, which relate to the non-class certified FHA and APA claims.

In a record hearing on May 25, 2007, the court heard oral arguments on the pending

motions.  During the record hearing, the court denied Defendant's Motion to Define Virgin

Islander, to which motion Plaintiffs had objected.  The court concluded that it would not define

the term "Virgin Islander" beyond the broad, function-based definition set forth by the Third

Circuit in <u>Chiang II</u>.  <u>See</u> <u>Chiang II</u>, 385 F.3d at 261-62 (discussing racial background of the

population of the Virgin Islands, thereby implicitly defining the population of the Virgin Islands

as Virgin Islanders).

Following the record hearing, Plaintiffs submitted, at the request of the court,

supplemental briefing on May 30, 2007 ("Response to Court's Request for Explanation and/or

Decision on Certain Issues Raised in Oral Argument of Cross Summary Judgment Motions,"

Docket No. 2511) (hereinafter "Plaintiffs' Post-Oral Argument Supplemental Brief").

The court has reviewed the cross-motions for summary judgment, the accompanying

briefs and other related pleadings as well as thousands of pages of exhibits filed therewith.

### III.   FACTUAL BACKGROUND

The court will here only briefly recount the factual background since the Third Circuit has

already discussed the basic claims in considerable detail in <u>Chiang II</u>.  This capsule view is

gleaned from the parties extensive pleadings and exhibits filed with their cross-motions now

reviewed.[5]

Defendant, the Secretary of the United States Department of Agriculture (USDA), has

established rural housing loan and grant programs throughout the United States, including the

_____

[5] While the parties have each filed a set of "undisputed facts" along with their motions,
each set is heavily disputed and filled with legal conclusions.

Territory of the Virgin Islands.  Rural Development[6] (RD) is a subsidiary agency of the USDA that administers several of these programs, providing direct loans, loan guarantees and grants. The specific programs at issue are loan programs administered by Defendant for single-family housing, pursuant to section 502 or section 504 of the Housing Act of 1949, 42 U.S.C. §§ 1472, 1474, currently implemented in 7 C.F.R. § 3550.1 et seq., known as "Section 502" and "Section 504" loans.  Section 502 direct loans provide low- and very-low income people living in rural areas with the opportunity to own a home.  See 42 U.S.C. § 1472(a); 7 C.F.R. § 3550.2.  Section 504 loans are intended for "very-low-income homeowners who cannot obtain other credit to repair or rehabilitate their properties."  7 C.F.R. §§ 3550.2; see also 42 U.S.C. § 1474; 7 C.F.R. §§ 3550.101, 3550.102.  Section 502 and 504 loans have their own specific eligibility requirements.  See 7 C.F.R. § 3550.53, 3550.103.

The programs that RD administers, as well as the regulations governing RD, have been revised several times during the nineteen-year period that this matter has been pending.  The structure of RD, as well as other USDA subsidiary agencies has also changed.  The court will not recount these details, as they are not relevant to determination of the pending motions.

There are local RD offices in localities throughout the United States that are managed by regional or state offices.  The structure of the loan application process during the relevant time period was such that local RD offices distributed loan applications, accepted completed

---

[6] The USDA has undergone many organizational changes in the last 25 years.  Names of subsidiary agencies, as well as the structure of those agencies, have frequently changed. Plaintiffs consistently refer to the subsidiary agency that administered Sections 502 and 504 loans as Rural Development (RD).  The majority of the evidence submitted also refers to this agency as RD.  Although Defendant refers to the subsidiary agency as the Rural Housing Services (RHS), rather than RD, the court will refer to the agency as RD, for the sake of record consistency.

applications for processing, processed the loan applications and made eligibility determinations, as well as other determinations, involved in the final decision as to whether to extend a loan to an applicant.  The Vermont/New Hampshire State RD office managed the local Virgin Islands RD offices[7] and programs from in the early 1980s[8] until June 1997.  On June 22, 1997, the Florida State Office took over management of the Virgin Islands' local RD offices.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 26, On-site Review Notes.)  It is the distribution of loan applications, or the failure to distribute loan applications, that is at the core of the controversy in this case.

It is undisputed that for a period of time during the years at issue, the local RD offices in St. Croix and St. Thomas kept a list of names of individuals interested in a loan application instead of physically distributing a loan application to every individual who requested one or who inquired about RD programs.  It is this list to which Plaintiffs refer as a "phony waiting list," and which the court will discuss in greater detail below.

In the spring of 1997, Gail Watson Chiang, a named plaintiff, sent three letters to USDA officials complaining of discrimination in the administration of RD loan programs in the Virgin Islands, among other complaints.  In July 1997, the USDA sent a fact-finding team comprised of several individuals to St. Croix to investigate the allegations in Chiang's letters.  (Pls.' Mot. Summ. J. Ex. 70, Civil Rights Compliance Review Report ("Report") 006449.)

---

[7] During the relevant time period, there existed two RD offices in the Virgin Islands, one in St. Croix and one in St. Thomas.  There is evidence that sometime after January 2000 the St. Thomas office was consolidated with the St. Croix office.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 7, Black Dep. 14, August 16, 2006.)

[8] There is record evidence that the Virgin Islands/New Hampshire office took over management of the Virgin Islands local RD offices in 1983 or before.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 4, Higgins Dep. 17, July 12, 2006.)

Also at issue here is the USDA's administrative complaints process.  Internal regulations establish an administrative system to receive complaints of discrimination in any program administered by Defendant, including the Section 502 and Section 504 loans at issue.  Within the USDA exists the Office of Civil Rights (OCR), which has been in place since 1997, although there existed a civil rights office within the USDA in some form since 1971.  (Def.'s Mot. Summ. J. 9 n.7.)  The filing of an administrative complaint with the OCR and its predecessor agencies is not a prerequisite to the filing of a discrimination civil action in district court against Defendant.  There is no exhaustion requirement.  <u>See generally</u> Nondiscrimination in USDA Conduct Programs and Activities, 63 Fed.Reg. 62963, 62963 (Nov. 10, 1998) (codified at 7 C.F.R. pt. 15, 15d).

## IV.   DEFENDANT'S MOTION TO DEFINE THE NATIONAL-ORIGIN DESIGNATION OF VIRGIN ISLANDER

Defendant filed a Motion to Define Virgin Islander wherein it is argued that the national origin designator "Virgin Islander" should be limited to individuals who are able to trace their ancestors to the Virgin Islands prior to 1917, the year the Virgin Islands became a United States territory.  Defendant recognizes that the Third Circuit used an implicitly broad definition of "Virgin Islander" in <u>Chiang II</u>, but argues that it is appropriate for this court to redefine "Virgin Islander" with reference to an individual's ancestry.  Plaintiffs opposed Defendant's motion, and emphatically argued that the only applicable definition of "Virgin Islander" is the Third Circuit's definition in <u>Chiang II</u>, which includes all residents of the Virgin Islands.  The court agreed.

Consistent with the record argument on May 25, 2007, the court is bound by the Third Circuit's opinion in <u>Chiang II</u> and Plaintiffs' selection of their own description, which is one of

inclusion, not exclusion.  The court understands from <u>Chiang II</u> that the term "Virgin Islander" is construed broadly to include all residents of the Virgin Islands during the relevant time period. As a result, Defendant's Motion to Define the Virgin Islander was denied.

## V.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

In the First Amended Complaint, Plaintiffs seek relief on six counts.  In Counts I through III, Plaintiffs allege that Defendant engaged in national origin discrimination in violation of the Equal Credit Opportunity Act (ECOA) by denying Virgin Islanders access to loan applications, failing to process those applications and taking other adverse actions against Virgin Islanders designed to deny them access to housing loans distributed by RD.  In Count IV, Plaintiffs Jacqueline Carr and Velsina George allege national origin discrimination in violation of the Fair Housing Act (FHA), and in Count V, Plaintiffs allege a violation of the Administrative Procedure Act (APA).  Count VI, alleging a violation of the Equal Protection Clause of the United States Constitution, has been effectively withdrawn by Plaintiffs and is no longer in the above-captioned matter.[9]

Defendant seeks summary judgment on Counts I through V.  Plaintiffs seeks summary judgment on Count I of the First Amended Complaint only.

## A.  Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

[9] See infra Section IV.G for discussion.

that the moving party is entitled to a judgment as a matter of law."  The moving party bears the burden of proving that no genuine issue of material fact is in dispute.  <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986).  A factual dispute is "material" only if it might "affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  There is only a "genuine" issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>  The court must examine the facts in a light favorable to the non-movant.  <u>Id.</u> at 255.  Furthermore, the court must resolve "all inferences, doubts and issues of credibility against the moving party."  <u>Smith v. Pittsburgh Gage & Supply Co.</u>, 464 F.2d 870, 874 (3d Cir. 1972) (citations omitted).

The Supreme Court has further explained that "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate <u>specific facts</u> showing that there is a genuine issue for trial."  <u>Id.</u> at 324 (emphasis added) (internal quotations and citations omitted).

The court will first consider Defendant's Motion for Summary Judgment, examining the evidence in the light most favorable to Plaintiffs.

**B.**     **ECOA Claims Generally**

In their First Amended Complaint, Plaintiffs argue that the Defendant discriminated against them by denying them access to the rural housing loan programs administered by Defendant in violation of ECOA.  Plaintiffs argue that the basis of the Defendant's discrimination was national origin, specifically, that Defendant discriminated against the Plaintiffs because they are Virgin Islanders.

Under ECOA, it is "unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex, or marital status."  15 U.S.C. § 1691(a).  It is undisputed that the USDA, including its subsidiary agencies whose programs are at issue in this litigation, is a creditor under ECOA. ECOA provides a right of action against creditors, including the United States.  15 U.S.C. § 1691e(a).

Plaintiffs bring three claims under ECOA.  The parties agree that these were certified by the Third Circuit as class claims.  See generally Chiang II, 385 F.3d at 256.

Count I focuses on allegations of discrimination occurring prior to the distribution of a loan application, specifically the use of a waiting list to control the distribution of applications rather than distributing applications upon demand.  Count I is brought on behalf of all Plaintiffs against the Defendant.

Count II focuses on alleged acts of discrimination occurring between the distribution of a loan application and the funding of a loan.  Specifically, Plaintiffs aver that applications were handed out, but were either not processed or, if processed, were rejected without adequate consideration, a course of conduct that Plaintiffs dub the "impossible yes."  Although the heading

of this count states that it is brought by several named Plaintiffs[10] against Defendant, it is clear from the language of the allegations that Plaintiffs intend this count to be class count.

Count III focuses on allegedly discriminatory acts occurring at or subsequent to the funding of a loan, including the failure to properly fund loans, participation in and ratification of the construction of substandard and defective housing, failure to investigate complaints of construction defect, failure to correct defects, harassment, and attempts to divest Plaintiffs of their housing and all payments made thereon. Again, the heading of this count states that it is brought on behalf of several named Plaintiffs[11] against Defendant, but the language of the allegations within the count shows that it is pled as a class count.

In addressing the cross-motions for summary judgment, the court will first address whether Plaintiffs' ECOA counts are to be addressed separately or together. Second, the court will address Defendant's argument that Plaintiffs' claims are not cognizable as national origin discrimination under ECOA. Third, the court will consider the timeliness and merits of each ECOA count and determine whether summary judgment should be granted in Defendant's favor. Only if summary judgment is not granted in favor of Defendant will the court determine whether summary judgment should be granted in Plaintiffs' favor on Count I.

---

[10] The named Plaintiffs, in the order they appear in the count, include Denise Pittman, Kimberly Oliver, Maria Blyden, Nartel Green, Andrea Carroll, Emeryl Christopher, Karen Hunt, Kaleen Clouden, Carmen McAlpin-Clarke, Frederick Freeman, Dave Nichols, Beverly Rawlins, Elena Herbert, Vaneta Martin, Ronald Mitchell, Shirley Williams, Laverne Williams and Precious Yearwood.

[11] Named Plaintiffs include Shirley Williams, Precious Yearwood, Vaneta Martin, Velsina Georgia and Jacqueline Carr.

1.     <u>Plaintiffs' ECOA counts will be considered separately.</u>

Plaintiffs oppose the treatment of the three ECOA counts separately, as they contend that together all three constitute one discriminatory pattern and practice and that to separate them is legally erroneous.[12]  (Pls.' Opp. Def.'s Mot. Summ. J. 6, n.1.)  They argue that if there is a genuine issue of material fact so as to defeat Defendant's Motion for Summary Judgment on any one count, summary judgment must also be denied as to the other two ECOA counts.  Plaintiffs, however, bring their Motion for Summary Judgment only on the issue of the use of the waiting list, which is the basis of Count I.  (<u>See generally</u> Pls.' Mem. Supp. Mot. Summ. J.)  Plaintiffs cannot have it both ways and they will not.  The court will consider the counts separately for all purposes, including timeliness and a determination on the merits.

2.     <u>Plaintiffs' ECOA counts allege discrimination on the basis of national origin.</u>

Defendant argues that, despite Plaintiffs' assertion that their allegations are of national origin discrimination, they are actually complaints of discrimination on the basis of geographical location, <u>i.e.</u>, the Virgin Islands, and that geographical location discrimination is not cognizable under ECOA.  (Def.'s Mem. Opp. Pls.' Mot. Summ. J. 3.)  The court finds that this argument is without merit.  Plaintiffs have elected to allege discrimination solely on the basis of national origin and such discrimination is cognizable under ECOA.  <u>See</u> 15 U.S.C. § 1691(a).  This holding, however, does not preclude the court's consideration of the impact of geographical

---

[12] Plaintiffs contend that the three ECOA counts are one coherent ECOA cause of action, which was divided into three parts by order of District Judge Moore, and that the division was made only for the convenience of the court.  Plaintiffs argue that "The three counts merely identify different points along the single 'Highway to Nowhere' pattern and practice."  (Pls.' Opp. Def.'s Mot. Summ. J. 6, n.1.)

location in its analysis of whether there is a genuine issue of material fact as to Plaintiffs'
allegations of national origin discrimination.

**C.      ECOA Count I**

The court will begin with Count I, Plaintiffs' first ECOA count.  The court determines
that Count I is not timely.  Section 741, a provision extending the statute of limitations for a
limited set of circumstances, is not applicable in this matter.  Further, there is no record evidence
that the actions alleged to constitute a pattern and practice of discrimination, namely the refusal
to hand out loan applications upon request and the utilization of an application waiting list,
occurred during the applicable statute of limitations period.  In the alternative, considering the
merits of the ECOA claim, the court concludes that there is no evidence from which national
origin discriminatory intent can be inferred, and that Plaintiffs have failed to raise a genuine issue
of material fact that national origin discrimination was standard practice for Defendant.

      1.      <u>Timeliness</u>

Defendant argues that Counts I through III of the First Amended Complaint are not timely
and that the court should grant summary judgment in favor of Defendant on this basis.  The court
will consider the issue of timeliness as to each individual count.  Having considered the
arguments and evidence submitted in support thereof with respect to Count I, the court finds that
Count I is not timely because Section 741 is inapplicable and Plaintiffs have not produced
sufficient evidence that the application waiting list was in use or that requests for applications
were denied during the statute of limitations period.

Under ECOA, the statute of limitations requires that a civil action be brought in the

district court within two years after an alleged ECOA violation.  15 U.S.C. § 1691e(f).  Since Plaintiffs filed this action on January 11, 2000, alleged violations of ECOA occurring prior to January 11, 1998 cannot be the basis of a timely action before this court.  However, this two-year statute of limitations may be extended through the tolling provision known as "Section 741," found at Pub. L. No. 105-277, § 741, 112 Stat. 2681 (October 21, 1998), codified at 7 U.S.C. § 2279 note.

The time period at issue in the First Amended Complaint is January 1, 1981 through January 10, 2000.  Defendant argues that Plaintiffs' ECOA claims are untimely because they do not allege the occurrence of any specific incident of discrimination during the two year statute of limitations period.  Defendant also argues that, to the extent that Plaintiffs allege a pattern or practice of discrimination, the conduct in question stopped prior to the statute of limitations period.  Plaintiffs disagree, and contend that, in addition to having alleged that specific acts of discrimination occurred during the statute of limitations period, under the continuing violation doctrine, allegations of discriminatory actions occurring before the statute of limitations period (from 1981 through January 10, 1998) are timely brought in this action.  In the alternative, Plaintiffs argue that Section 741 is applicable to this case because of class complaints filed with the USDA by named Plaintiff Gail Watson Chiang and that, therefore, the ECOA counts are timely.

The court will address Plaintiffs' arguments in reverse order, determining first whether Section 741 is applicable to Plaintiffs' ECOA claims.  If Section 741 is not applicable to extend the statute of limitations for Count I, the court will determine whether there exists a genuine issue of material fact as to whether Count I meets the ECOA statute of limitations.

a.      Section 741 does not apply to the facts of this case and therefore cannot
extend the statute of limitations.

The Omnibus Consolidated & Emergency Supplemental Appropriations Acts, 1999, Pub.

L. No. 105-277, § 741, 112 Stat. 2681 (October 21, 1998), codified at 7 U.S.C. § 2279 note,

known as "Section 741," retroactively extends the statute of limitations period in certain

circumstances.  Specifically, Section 741 applies to situations in which an "eligible complaint" of

discrimination was filed with the USDA between January 1, 1981 and July 1, 1997 for alleged

acts of discrimination occurring between January 1, 1981 and December 31, 1996.[13]  Garcia v.

Johanns, 444 F.3d 625, 629 n.4 (citing Section 741(e)).  An eligible complaint must allege that

there occurred a violation of ECOA in the administration of certain housing programs, and the

complaint must be unrelated to employment.  Section 741(e).  Finally, an eligible complaint must

be in writing.  7 C.F.R. § 15f.4.  If an eligible complaint had been filed, Section 741 would

extend the ECOA statute of limitations in this matter and alleged violations of ECOA occurring

between January 1, 1981 and December 31, 1996 would be timely brought in this complaint.

The issue before the court, then, is whether an eligible complaint was actually filed.

The Federal Regulations include a lengthy discussion of the circumstances that brought

Section 741 into effect:

> During much of the 1980's and 1990's[sic], the USDA
> administrative processes for review of program civil rights

---

[13] Section 741 provides, in relevant part:
(a) To the extent permitted by the Constitution, any civil
action to obtain relief with respect to the discrimination alleged in
an eligible complaint, if commenced not later than 2 years after the
date of the enactment of this Act [October 21, 1998], shall not be
barred by any statute of limitations.

complaints filed against USDA agencies by program participants did not function effectively.  As a result, while administrative complaints were pending, the statutes of limitation for certain discrimination statutes under which complainants potentially could obtain relief continued to run and the time periods available for obtaining relief expired, thus foreclosing the possibility for relief for those who had filed discrimination complaints administratively with the Department.  Accordingly, the Secretary of Agriculture sought the enactment of legislation to waive the applicable statutes of limitation for those individuals who had filed nonemployment related discrimination complaints with USDA alleging discrimination during that time period.

Administrative Civil Rights Adjudications Under Section 741, 63 Fed. Reg. 67,392 (Dec. 4., 1998) (codified at 7 C.F.R. § 15f).

> i.    <u>Chiang sent several letters to USDA officials complaining of discrimination and the Governor of the Virgin Islands sent a letter to the USDA repudiating Chiang's allegations.</u>

Plaintiffs argue that an "eligible complaint" was filed with the USDA by named plaintiff Chiang on behalf of a class of individuals when she sent several letters to USDA officials complaining of discrimination in the administration of RD housing programs in the Virgin Islands.  The three letters at issue are dated March 5, 1997, March 24, 1997 and April 8, 1997.

Chiang's March 5, 1997 letter was addressed to Helen Cordero, Civil Rights Staff, USDA, Rural Development.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 36, Chiang March 5, 1997 Lttr. 6428).  It was written on the official letterhead of the Office of Governor Dr. Roy L. Schneider, and Chiang signed the letter with her name and the title, "Special Assistant to the Governor."  (<u>Id.</u> 6430.)  In her letter, Chiang stated that the Office of the Governor had received many complaints suggesting preferential and discriminatory practices in the local RD office and in the regional office in Vermont.  (<u>Id.</u> 6428.)  Chiang articulated concerns that the loan program

applications and the mortgage holders in the Virgin Islands were being treated inequitably, and

she requested that the Civil Rights office initiate an investigation.  (Id. 6428-6430.)  Chiang

listed several examples of what she characterized as inequitable treatment: "St. Croix office['s]

refusal to give out loan application forms under the guise of program slow down or limitation of

funds, violates Equal Opportunity statue[sic]"; "Many policies implemented in the regional

offices are believed to be inconsistent and many times contrary to policies practiced in the Virgin

Islands.  This may be in violation or in conflict with Federal Regulation and Guideline";

supervisors who were transferred to the local RD office mistreat local employees as well as

residents of the Virgin Islands; and, such treatment "painfully reminds our constituents of

Slavery sufferings of bygone days."  (Id. 6429-6430.)

Chiang's second letter, dated March 24, 1997, was addressed to Pearlie Reed, Acting

Assistant Secretary of Administration, USDA.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 37,

Chiang March 24, 1997 Lttr.)  The subject line of this letter was "Request Investigation for

Possible Obstruction of Inquiries Regarding the Alleged Discrimination Practice in Rural

Development Offices in the United States Virgin Islands."  (Id. 6433.)  This letter focused on

Chiang's contention that her job with the Office of the Governor had been threatened after she

sent her March 5th letter to Helen Cordero and upon her belief that an RD official contacted the

Governor's office after receipt of her March 5th letter.  (Id. 6433-36.)  Chiang inquired whether

any RD official contacted the Governor's office after receipt of her March 5th letter.  (Id. 6435.)

Chiang's employment was not the exclusive focus of this letter, however, as she also stated a

belief that the supervision of the Virgin Islands' loan program applications by the New

Hampshire and Vermont offices allowed preferential treatment or discrimination.  (Id. 6435.)

Chiang alleged that supervisors who were transferred to the Virgin Islands from New Hampshire "exploit and expound on DISCRIMINATION in this predominantly Black and Minority community." (Id. 6536.)  She further stated that "I will continue to seek the TRUTH regarding the program issue, preferential treatment and discrimination practice in your Rural Development offices both in the United States Virgin Islands and your regional offices in Vermont and New Hampshire.  Perhaps you can come to our islands and investigate in person whether the allegation is unfounded or blatantly existed for a long time." (Id. 6436 (emphasis in original).)  This letter, which was not on the official letterhead of the Office of the Governor, stated that she was writing as a private citizen. (Id. 6433.)  Chiang copied this letter to several USDA officials, including the Secretary of the USDA.

Chiang's third letter, dated April 8, 1997, was also addressed to Reed and was captioned "DISCRIMINATION COMPLAINT." (Def.'s Mem. Supp. Mot. Summ. J. Ex. 39, Chiang April 8, 1997 Lttr. (emphasis in original).)  She stated that she was "writing to formally file a Discrimination Complaint against the United States Department of Agriculture, also known as the Farmers Home Administration." (Id.)  This letter focused on Chiang individually.  She contended that she had been subjected to discrimination on the basis of race and gender, as well as retaliation because of her discrimination complaints.  Finally, Chiang alleged that her employment was threatened as a result of the complaints she had made to the USDA. (Id.)

Chiang's first two letters alleged widespread, systemic discrimination on the basis of national origin and race in the administration of certain RD housing programs in the Virgin Islands.  In determining whether they provided the USDA with notice that Chiang, and others, were complaining of national origin discrimination, the court must look at concurrent

information provided to the USDA.  Following Chiang's second letter, Governor Dr. Roy L.

Schneider sent a letter, dated March 17, 1997, to Helen Cordero, Civil Rights Staff, Rural

Development.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 38, Governor Schneider March 17, 1997

Lttr.)  Governor Schneider's letter was a complete repudiation of Chiang's complaints and

allegations, and stated that, "Neither I, nor any member of my immediate staff have received any

complaints outlined in Mrs. Chiang's letter of March 5th. . . . It is certainly not the position of the

officials of the V.I. Housing Authority, the V.I. Finance Authority or myself that there has been

any discrimination toward us from any person sent to work in the Virgin Islands by the Rural

Development Agency."  (Id.)  Continuing, Governor Schneider attributed Chiang's complaints to

her personal feelings, "It is evident from the tone and content of the letter that Mrs. Chiang

harbors some personal feelings against certain Rural Development staff members.  Moreover, her

complaints and allegations were not substantiated by our investigation and are incorrect."  (Id.)

Governor Schneider's letter not only undercut Chiang's allegations of discrimination but also

discredited her statement that the Office of the Governor has received multiple complaints of

discrimination from other Virgin Islands residents.

ii.      Rural Development's response to Chiang's letters.

Despite the sweeping scope of Governor Schneider's repudiation, RD officials did put

together an investigation in response to Chiang's letters.  On May 16, 1997, Cheryl Prejean

Greaux, the Director of the Civil Rights Staff of RD, sent Chiang a letter stating that

> The Civil Rights Staff of Rural Development will conduct an
> investigation into your concerns as expressed in your March 5,
> 1997 letter to Ms. Helen Cordero of my staff, your March 24, 1997
> and April 8, 1997 letter to Pearlie Reed.  We will conduct this

investigation in early July, 1997 as we have to collect data for
analysis from our program area prior to coming on site.

(Def.'s Mem. Supp. Mot. Summ. J. Ex. 24, Prejean Greaux May 16, 1997 Lttr.)  RD Civil Rights

Staff conducted an investigative trip to the Virgin Islands in July 2007.  (Def.'s Mem. Supp. Mot.

Summ. J. Ex. 27, Smulkstys Oct. 17, 1997 Lttr.)

The record contains two documents that resulted from this trip.  The first is titled "Notes

from Virgin Island On-site Review" (hereinafter "On-Site Review Notes") and addressed to

Prejean Greaux.[14]  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 26, On-Site Review Notes).  The On-

Site Review Notes, dated August 25, 1997, list several areas of concern as expressed by Virgin

Islands' residents regarding the administration of RD programs: the use of a waiting list for a

Homebuyers Education Class, the inability to obtain an application for the financing of a single

family home through Rural Development, and discrimination.[15]  The second document is the

Report of the Civil Rights Compliance Review for the Virgin Islands ("Report"), which discusses

the findings and observations of the fact-finding trip, including that there was a waiting list to

receive a loan application.[16]  (Pls.' Mot. Summ. J. Ex. 70, Report.)  The Report draws some

_____

[14] It cannot be discerned from the face of the document whether Prejean Greaux herself prepared these notes, or whether they were prepared for her information by another member of the investigative team.

[15] The On-Site Review Notes do contain some conclusions about whether RD engaged in discrimination in the Virgin Islands.  At this point, though, the court is only concerned with the issue of timeliness and whether Chiang's letters constitute a complaint under Section 741.  Whether the investigative committee concluded that discrimination existed in the administration of the RD office in the Virgin Islands is only relevant at this point in that discussion of discrimination demonstrates that the USDA officials were aware that discrimination was a potential issue.

[16] The Report indicates the dates of the investigative trip were October 19-29, 1997.  These dates are at odds with the remainder of the record evidence, and the court concludes that

conclusions as to the implications of those findings, specifically that RD engaged in systemic

discrimination in the Virgin Islands, with race, gender and national origin all being factors.  (Id.

6449.)

On October 17, 1997, Inga Smulkstys, Deputy Under Secretary, Operations and

Management, Rural Development, sent a letter to Chiang regarding the on-site investigation,

stating, in part, that:

> The Rural Development Civil Rights Staff conducted an
> investigation July 14-18, 1997, into the concerns you expressed in
> your March 5, 1997, letter to Ms. Helen Cordero and your March
> 24, 1997 and April 8, 1997 letters to Mr. Pearlie Reed.  The major
> focus of the review was to investigate the concerns of the island
> residents and their inability to obtain Rural Development financing
> for a single home.

(Smulkstys Oct. 17, 1997 Lttr.)

iii.   Defendant understood Chiang's letters to be complaints of
discrimination.

Defendant argues that it did not understand Chiang's letters to be complaints of

discrimination and that they therefore cannot now be considered, either individually or

collectively, to be an "eligible complaint" of discrimination under Section 741.  To support its

argument, Defendant has submitted a Declaration from Frederick D. Isler, Deputy Director for

Programs, Office of Civil Rights, USDA (Def.'s Mem. Supp. Mot. Summ. J. Ex. 33, Isler Dec.)

as well as a Declaration from Cheryl Prejean Greaux (Def.'s Mem. Supp. Mot. Summ. J. Ex. 34,

Prejean Greaux Dec.).  In his Declaration, Isler states that a review of the databases of civil rights

complaints revealed several letters written by Chiang which "were not considered to constitute

the weight of the evidence shows that the that the investigative trip occurred in July 1997.  The
timing of the trip, however, has no impact on any of the court's substantive analysis.

the filing of written complaints of discrimination."[17]  (Isler Dec. ¶ 6.)  In the databases, however,

there is a record of receipt for a written complaint filed by Chiang dated July 22, 1997, alleging

"retaliation in response to her request for an investigation regarding discrimination in the

operation of the USDA conducted farm loan and rural development programs."  (Isler Dec. ¶ 4.)

Isler also notes that the USDA received complaints from 18 other individuals in the Virgin

Islands who alleged discrimination in the operation of a USDA conducted residential rural

housing loan program.  (Isler Dec. ¶ 3.)  In her Declaration, Prejean Greaux states that Rural

Development has a record of receiving written complaints from three individuals in the Virgin

Islands.  (Prejean Greaux Dec. ¶ 3.)  She specifically states that Chiang's March 5, 1997 letter

was not considered to be a filing of a written complaint of discrimination, and that this letter did

not refer specifically to residential rural housing loan programs.  (Prejean Greaux Dec. ¶ 4.)

        Despite Isler and Prejean Greaux's statements that none of Chiang's letters were

considered to be a "written complaint of discrimination," the USDA responded to the allegations

in Chiang's letters.  In her deposition, Prejean Greaux indicated that because the scope of

Chiang's letters included program and employment issues, the letters warranted investigation.

(Def.'s Reply Mem. Supp. Mot. Summ. J. Ex. 110, Prejean Greaux Dep. 88, June 14, 2006).

Although Prejean Greaux acknowledges that Chiang's use of the Governor's letterhead was a

factor in prompting investigation, she also stated that, even without that factor, the scope of the

letters would have prompted her investigation.  (Id. 88-89).

        The court finds that, in spite of Governor Schneider's letter to Helen Cordero, the

Defendant's multi-level response to Chiang's letters, including an on-site investigation of her

---

        [17] These letters are those dated March 5, 1997, March 24, 1997 and April 8, 1997.

allegations, demonstrates that Defendant understood that the concerns expressed in Chiang's letters remained in force and could not be considered withdrawn by reason of Governor Schneider's letter.  Courts confronted with the question of whether letter "complaints" qualify as eligible complaints under Section 741 have considered multiple factors, including whether the letters clearly allege discrimination.  See, e.g., Visconti v. Veneman, 204 Fed. Appx. 150, 153 (3d Cir. 2006) (not precedential) (citing Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002), for the proposition that a charge of discrimination must give the defendant adequate notice of the charge and its basis).  The court finds that Chiang's first two letters contained language that would, and did, lead the Defendant to believe that Chiang, on behalf of herself and others, was complaining of discrimination on the basis of national origin and race.

          iv.     <u>Chiang's letters do not constitute an "eligible complaint" under Section 741.</u>

Section 741(e) defines an "eligible complaint" as follows:

> (e)    As used in this section, the term 'eligible complaint' means a nonemployment related complaint that was filed with the Department of Agriculture before July 1, 1997 and alleges discrimination at any time during the period beginning on January 1, 1981 and ending December 31, 1996 –
> (1)    in violation of the Equal Credit Opportunity Act (15 U.S.C. § 1691 et seq.) in administering –
> (A)    a farm ownership, farm operating, or emergency loan funded from the Agricultural Credit Insurance Program Account; or
> (B)    a housing program established under title V of the Housing Act of 1949; or
> (2)    in the administration of a commodity program or a disaster assistance program.

Section 741(e).

An eligible complaint is one that meets the requirements of Section 741(e).  Section 741 is a waiver of sovereign immunity, and agency action cannot expand or contract the time frame that is contained therein.  See, e.g., Ordille v. United States, 216 Fed. Appx. 160, 167-68 (3d Cir. 2007) (not precedential) (concluding that letters from USDA to complainants stating that their complaint met the requirements of Section 741 to waive the statute of limitations could not transform the complaint that was filed on January 1, 1998 into an "eligible complaint" filed before July 1, 1997 because the eligibility requirements are jurisdictional prerequisites that cannot be waived by agency action).  As a result, Defendant's investigation of Chiang's allegations cannot be interpreted as an admission that her letters are an eligible complaint under Section 741.  Similarly, Defendant's representation that it did not categorize Chiang's letters as complaints in its civil rights complaint databases is not determinative of whether they qualify as an "eligible complaint."  The court must examine each element of Section 741(e) in turn.

1.  Filed with the Department of Agriculture before July 1, 1997

The applicable federal regulations define a "complaint" as a "written document filed with USDA by a person alleging discrimination by USDA under a covered program."  7 C.F.R. § 15f.4; see also Abercrombie v. U.S. Dep't of Agriculture, Slip Copy, No. Civ. A. 04-143-WOB, 2006 WL 1371590, at *4 (E.D. Ky. May 18, 2006) (finding it improper to look beyond the four corners of the written complaint to oral complaints).  In addition, the requirement that a complaint be "filed" with the USDA anticipates that complaints will be written.  7 C.F.R. § 15f.27 ("A document, or other item, that must be 'filed' under these rules is considered filed when postmarked or when it is received and date-stamped by the Docketing Clerk.").

The court concludes that because Chiang's letters were writings that were mailed to the USDA prior to July 1, 1997, this requirement of Section 741(e) is met.

2.  Non-employment related complaint alleging discrimination in violation of ECOA in the administration of a housing program established under title V of the Housing Act of 1949

The court finds that Chiang's correspondence presents class-wide allegations of systemic discrimination in the administration of RD housing loan programs in the Virgin Islands under the Vermont/New Hampshire administration, that the alleged discrimination was against the residents of the Virgin Islands and on the basis of race and national origin, and that the alleged discrimination included creating obstacles to prospective applicants attempting to obtain applications for RD sponsored loan programs.  Although the letters do include some discussion of complaints concerning employment, this is not the primary focus of the first two letters, and the court finds Chiang's first two letters to be a "non-employment related complaint."  Despite the fact that Chiang does not specifically reference ECOA, she clearly references an "Equal Opportunity statute."  In addition to Chiang's references to Rural Development, she also mentions the Farmers Home Administration, the USDA, the New Hampshire/Vermont office's supervision of the Virgin Islands office, and "farm and home loan opportunities."  These references suffice to identify her complaint as alleging that discrimination existed in violation of ECOA in the administration of a housing program established under Title V of the Housing Act of 1949.  This second prong of Section 741(e) is met.

3.      Alleging such discrimination took place between January 1, 1981 and December 31, 1996

It is on the third prong of Section 741(e) that Chiang's letters fail to qualify as an "eligible complaint."  Her letters do not specify when alleged acts of discrimination occurred or when allegedly discriminatory practices were in place.  Chiang's letters are devoid of any dates or time periods whatsoever.  This omission is fatal to Plaintiffs' argument that Section 741 extends the statute of limitations for their ECOA counts.

Section 741 is a waiver of sovereign immunity.  See Ordille, 216 Fed. Appx. at 167.  Under law, "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."  Lane v. Pena, 518 U.S. 187, 192 (1996) (citations omitted); see also Ordille, 216 Fed. Appx. at 167 (finding "that the eligibility requirements of Section 741 create a jurisdictional prerequisite to the waiver of sovereign immunity contained in the ECOA must be strictly construed in favor of the Government.").  The letters were sent several months after December 31, 1996, and it cannot be assumed that the allegedly discriminatory incidents and practices complained of occurred before December 31, 1996.  Since there are no dates alleged in Chiang's letters, any reader of the letter would have to engage in pure speculation as to the time frame.  To engage in this type of speculation would be to impermissibly contravene the requirement that waivers of the Government's sovereign immunity are to be strictly construed.

Plaintiffs have argued that Chiang elaborated upon the allegations in her letters in conversations with Lloyd Wright, the Civil Rights Director for the USDA, in May 1997.[18]

---

[18] Plaintiffs also point to a February 16, 1999 letter Chiang wrote to Vermont Senator Patrick J. Leahy.  (Pls.' Index Supp. Pls.' Opp. Def.'s Mot. Summ. J. Ex. 36, Chiang Feb. 16,

Although there is evidence that Chiang complained of discrimination in those conversation, the court, as stated before, may not look to oral complaints as a supplement to written complaints in determining whether the written complaint filed with the USDA meets the elements of an "eligible complaint." See, e.g., Abercrombie, 2006 WL 1371590, at *4 (finding that "the court improperly extended the Government's waiver of sovereign immunity when it looked at the oral complaints along with the written complaint in determining whether the complainant has met the elements of an 'eligible complaint,' because a waiver of sovereign immunity must be strictly construed in favor of the sovereign."). The court has held that Section 741(e) requires that an eligible complaint be made in writing, and that it must contain certain information about what is being alleged and when. The requirements of Section 741(e) are precise and the court is not permitted to read such a waiver of sovereign immunity broadly.

In sum, this third prong of Section 741(e) is not met, and Chiang's letters are not an "eligible complaint" under Section 741. Having concluded that no "eligible complaint" was filed and that Section 741 does not apply to extend the statute of limitations for Plaintiffs' ECOA counts, the court is not required to address Defendant's argument that Chiang's letters cannot qualify as an "eligible complaint" on behalf of the entire class.

> v.   No other complaints filed qualify as an "eligible complaint"
>      pursuant to Section 741(e).

Plaintiffs argue that they have submitted evidence that every named plaintiff filed an "eligible complaint" or authorized one that was filed on his or her behalf and cite to the

---

1991 Lttr.) This letter is of no significance to the court's determination of whether an "eligible complaint" was filed.

Affidavits of Plaintiffs included in the record evidence.  (Pls.' Opp. Def.'s Mot. Summ. J. 34.)

Plaintiffs contend that these affidavits are sufficient to defeat summary judgment because they

contain testimony that meets the requirements of Section 741(e), and that, taken in the light most

favorable to Plaintiffs, this testimony is determinative in Plaintiffs' favor.  (See Pls.' Index Supp.

Pls.' Opp. Def.'s Mot. Summ. J. Ex 23, Pls. Affidavits.)  These affidavits, however, do not

address each prong of Section 741(e).  They each state that "On or about [date], I made a

complaint that I had been discriminated against in one of Defendant's housing loan or benefit

programs to the United States Department of Agriculture."  (Id.)  The affidavits do not specify

how these complaints were "made."  Under Section 741(e), an "eligible complaint" must be filed

with the USDA prior to July 1, 1997.  An "eligible complaint" must be in writing.  These

affidavits do not state whether the complaint made by each affiant was made orally or was made

in writing.  This distinction is critical, as the affidavits fail to meet one of the essential elements

of an "eligible complaint" under Section 741(e).  None raises a genuine issue of material fact that

any of the named plaintiffs, who submitted such an affidavit, actually filed an "eligible

complaint' under Section 741(e).

Finally, to the extent that Plaintiffs' argue that the letter sent on behalf of Precious

Yearwood on December 16, 1991 is an "eligible complaint" on behalf of the class, the court finds

this argument to be without merit.  (See Pls.' Index Supp. Opp. Def.'s  Mot. Summ. J. Ex. 38,

Yearwood Dec. 16, 1991 Lttr.)  From the face of Yearwood's letter it is clear that it is an

individual complaint of discrimination on the basis that race and sex "led to acceleration of her

account and the upcoming foreclosure proceeding."  (Id. 5632.)  Her complaint alleges

discrimination of a different type and based upon different transactions than national origin

which solely is at issue here.  Thus, this court is prohibited from considering Yearwood's letter

an "eligible complaint."

        b.      Whether the complaints are timely under the ECOA statute of limitations

Next, the court must address Defendant's contention that summary judgment is

appropriate because Plaintiffs have failed to produce any specific evidence to establish that the

application waiting list was in use during the applicable limitations period (January 10, 1998 –

January 10, 2000).  Plaintiffs argue that Count I is timely under the ECOA statute of limitations

and the continuing violations doctrine.[19]  First, the court must determine whether Plaintiffs have

produced such evidence so as to raise a genuine issue of material fact that any of the allegedly

discriminatory actions comprising the pattern and practice alleged in Count I occurred during the

limitations period.[20]  Second, only if Plaintiffs have met that burden is the court required to

determine whether the continuing violations doctrine applies to alleged instances of

discrimination occurring prior to the statute of limitations period.[21]

---

[19] Even if the court had determined that Section 741 applied to extend the statute of limitations, the court would still be required to determine whether alleged actions of discrimination occurring after December 31, 1996 are timely before this court.

[20] Plaintiffs appear to argue that the statute of limitations never began to run for certain class members because they are not aware that they have been injured.  (Pls.' Opp. Mot. Summ. J. 32-33.)  Plaintiffs have failed to produce any specific evidence as required by Rule 56 in support of this argument.  Plaintiffs conflate failure to receive a loan application with lack of awareness of injury.  Conclusory arguments of counsel are insufficient to raise a genuine issue of material fact.  Fed. R. Civ. P. 56(e)(1) ("an opposing party may not rely merely on allegations or denials in its own pleading").

[21] The continuing violations doctrine exists as an equitable exception to the requirement that a complaint must be timely filed.  Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (citing West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995)).  "[W]hen a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the

i.  <u>Plaintiffs have not produced sufficient evidence that any class members who requested an application during the limitations period was denied an application and/or added to a waiting list.</u>

Plaintiffs contend that they have offered "substantial evidence" of discriminatory acts that took place between January 10, 1998 and January 10, 2000.  (Pls.' Opp. Def.'s Mot. Summ. J. 27.)  Plaintiffs rely on interrogatory answers and one deposition in support of their argument that, during the limitations period, class members were added to the waiting list, that class members who requested an application were denied an application and that the practice of using an application waiting list continued.  (Pls.' Opp. Def.'s Mot. Summ. J. 27-30, citing Pls.' Answers to Def.'s First Set Interrogs., Interrog. No. 1; Pls.' Answers to Def.'s Second Set Interrogs., Interrog. No. 13; and Gomes Dep. 50-51.)

Reviewing Plaintiffs' Answers to Defendant's First Set of Interrogatories and Request for Production, Interrogatory No. 1, the court finds only one incident during the limitations period in which Defendant did not provide a loan application: a 1998 incident involving Karen Hunt. Specifically, the interrogatory answer states that:

> [In 1998] Karen Hunt called the Rural Development Office again to try to obtain a loan application.  Again, defendant refused to give her one.
> (Def.'s Mem. Supp. Mot. Summ. J. Ex. 32, Pls.' Answers Def.'s First Set Interrogs. 58.)

---

continuing practice <u>falls within the limitations period</u>; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."  <u>Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.</u>, 927 F.2d 1283, 1295 (3d Cir. 1991) (emphasis added).  Thus, if no acts occurred during the limitations period, the continuing violations doctrine is not applicable.

> Thereafter, in or about 1998, Ms. Hunt called the Rural
> Development Office again to try and obtain a loan application.
> Defendant asked Ms. Hunt about her income, and then summarily
> rejected her attempt to obtain an application by telling her that she
> was not eligible to apply for a loan.  Just as on prior occasions,
> defendant let Ms. Hunt believe said ineligibility determination was
> final and non-appealable and that she had no other recourse.
> (Pls.' Index Supp. Pls.' Opp. Def.'s Mot. Summ. J. Ex. 24, Pls.'
> Answers Def.'s First Set Interrogs. 130.)

Hunt's deposition testimony elaborates as to what transpired during her conversation with

Defendant, and clearly states that she did not request a loan application during this call.  Hunt

testified that she called RD in or around 1998 to ask whether RD had funding.  (Def.'s Reply

Supp. Mot. Summ. J. Ex. 92, Hunt Dep. 47-49, May 12, 2006.)  This was not Hunt's first contact

with RD.  She had previously contacted the office several times after she had been determined

ineligible to inquire whether the eligibility guidelines had changed.  (Id. 45-47.)  In 1998, she

contacted RD "to find out if [she] qualified for any program that they had." (Id. 47.)  In this

conversation, Hunt and the RD employee discussed "some basics like around income and

housing composition, family composition, and things like that." (Id. 48.)  Hunt was told that she

was not eligible for assistance.  (Id. 49.)  The RD worker told Hunt that "she wouldn't – she

wouldn't even give me an application." (Id.)  At her deposition, Hunt, however, unequivocally

conceded that she did not ask for an application.  (Id. 49.)  Moreover, nowhere in Hunt's

Answers to Defendant's Interrogatories or her deposition does she state that she was placed on an

application waiting list in 1998.

     The court concludes that, viewing together Hunt's Answers to the Defendant's

Interrogatories[22] and deposition in a light most favorable to Plaintiffs, they are insufficient to raise a genuine issue of material fact that in 1998 she requested an application from RD and that RD denied the request.  Nowhere does she state that she requested an application from RD.  In fact, Hunt's deposition testimony is absolute that she never requested an application.  Further, she stated that she called RD to see if she was eligible for any programs.  Hunt did not state that she contacted RD in order to obtain a loan application.

Next, Plaintiffs argue that Defendant continued to maintain and use the application waiting list during the limitations period.  Specifically, Plaintiffs allege that the names of multiple class members were added to the waiting list during the limitations period.  During oral argument, Plaintiffs counsel contended that approximately 100-300 class members had their names added to the waiting list during the limitations period.  (Oral Arg. Tr. 70, May 25, 2007.) In support of this argument, Plaintiffs direct the court to a table included in their answers to Defendant's Second Set of Interrogatories.  (Pls.' Mot. Summ. J. Ex. 65, Pls.' Answers Def.'s Second Set Interrogs., No. 13 45-82.)  This table lists class members, the year that their names were added to the waiting list, the year that they were placed on the waiting list, and the year in which they received an application, if ever.  (Id.)  Entries for multiple individuals suggest that their names were added to the application waiting list in the years 1998, 1999 and 2000, or in some range of years including at least one of those years.  (Id.)  During oral argument, the court inquired as to how Plaintiffs determined that this group of class members had been added to the list after January 11, 1998.  (Oral Arg. Tr. 70-71, May 25, 2007.)  The court specifically asked

---

[22] Hunt did sign a verification that her answers to Defendant's interrogatories were true and correct.  (Pls.' Mot. Summ. J. Ex. 63, Pls.' Answers Def.'s First Set Interrogs. unnumbered page.)

whether counsel had spoken with each of those individuals, a question that counsel did not directly answer.  Instead, Plaintiffs' counsel responded that "Each of those people are contained on the waiting list itself.  That's evidence – we simply established the time line."  (Oral Arg. Tr. 71, May 25, 2007.)  Plaintiffs also made reference to their "investigation."  (Id.)

The parties, however, have submitted as record evidence what they represent to be an accurate copy of all that exists as an application waiting list.  (Pls.' Mot. Summ. J. Ex. 69, Waiting List.)  From the face of the document, it is not apparent how Plaintiffs' counsel could determine the date on which anyone was added to the list.  There is not a column for "date added" or "date application requested."  Nothing indicates on what date, or even in what year, an individual's name and contact information were added to the waiting list.

There is another deficiency with Plaintiffs' counsel's representation to the court that certain class members whose names appear in the Table had their names added to the waiting list during the limitations period.  The court's extensive review of the numerous verifications shows that, with the exception of Karen Hunt, none of these individuals completed a verification acknowledging that he or she had reviewed the interrogatory answers.  Federal Rule of Civil Procedure 33(b)(2) states that "The answers [to the interrogatory] are to be signed by the person making them."  Nothing from the interrogatory answers even suggests that any plaintiff who did verify his or her interrogatory answers had any personal knowledge that anyone was added to the application waiting list during the limitations period.  None of the group, who is represented to have been added to the application waiting list during the limitations period answered the interrogatory, with the exception of Hunt.  Therefore, Plaintiffs' counsel's assertion that the table demonstrates that certain individuals had their names added to the waiting list in the limitations

period is factually unsupported and constitutes mere argument.  Arguments by counsel, if

unsubstantiated by specific evidence, are not sufficient to create a genuine issue of material fact.

See Fed. R. Civ. P. 56(e)(2).

Interestingly, with respect to Hunt, Plaintiffs do not argue that she was added to a waiting

list in 1998.  Perhaps, this is because in her interrogatory answer and in her deposition testimony,

she never stated that she was added to an application waiting list in 1998.  Viewing the evidence

together, and in a light most favorable to Plaintiff, the court finds that there is not sufficient

evidence to raise a genuine issue of material fact that Hunt was added to an application waiting

list in 1998, despite the inclusion of her name on the non-specific table submitted to the court.

Next, Plaintiffs allege that the names of several class members remained on the physical

waiting list and/or that these individuals were never given a loan application by Defendant, and

that the statute of limitations has not yet started to run for these individuals.  Whether the

physical waiting list itself still exists somewhere is irrelevant to whether Defendant continued to

maintain the practice of keeping an application waiting list during the limitations period.  The

court addressed Plaintiffs' argument that the statute of limitations has not yet begin to run for

individuals who have not yet received a loan application from Defendant above.  In addition, the

court finds that Plaintiffs have not produced evidence to rebut Defendant's evidence that in 1997,

the St. Croix office attempted to notify all individuals on the list that applications were available

and that Defendant sent such a notification to over 80% of the individuals on the list, that is, to

every person on the list for whom Defendant was able to obtain a mailing address.  (Def.'s Reply

Mem. Supp. Mot. Summ. J. Ex. 91, Bryant Dep. 19-22, Aug. 18, 2006.)

Plaintiffs have not produced any affidavits, deposition testimony or any other specific evidence to support their claims that between January 11, 1998 through January 11, 2000, (1) the waiting list was still in use in the local RD offices, (2) that class members were denied an application upon request, and (3) that class members were added to the application waiting list. Thus, they have not met their obligations as set forth by the Rule 56(e)(2) of providing factual specificity to "support each essential element of [their] claim."  Galante v. Cox, Civil Action No. 05-6739, 2006 WL 3069461, *5 (E.D. Pa. Oct. 25, 2006) (citing Celotex, 477 U.S. at 322-23).

        ii.      <u>Plaintiffs have not filed a motion pursuant to Federal Rule of Civil Procedure 56(f) requesting that summary judgment on the issue of timeliness of any ECOA count be denied or continued to enable further discovery.</u>

During oral arguments, Plaintiffs argued that they had been prohibited by the Magistrate Judge from conducting discovery of 2,000 individuals whose testimony, they now assert, would support Plaintiffs' position that Count I is timely.  (Oral Arg. Tr. 69-70, May 25, 2007.)  In their Opposition to Defendant's Motion for Summary Judgment, Plaintiffs request that "if the Court is entertaining the notion that there is insufficient evidence of pattern and practice between 1998 and 2000, plaintiffs request the opportunity to provide testimony from each and every class member who was denied an application and/or put on the 'waiting list' during that period."  (Pls.' Opp. Def.'s Mot. Summ. J. 30, n.10.)

Plaintiffs, however, have not filed a motion pursuant to Fed. R. Civ. P. 56(f)[23] with

---

[23] Rule 56(f), titled, "When Affidavits Are Unavailable", provides that:

> If a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

respect to Defendant's Motion for Summary Judgment on the ECOA counts.[24]  The court cannot construe Plaintiffs' request to provide them with the opportunity to conduct further discovery as a 56(f) motion.  That Rule clearly requires the opposing party to "show[] by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition."  Neither Plaintiffs nor Plaintiffs' counsel have submitted any such affidavit to the court, and so Plaintiffs are presently obligated to "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Plaintiffs must support each essential element of their claim with specific record evidence.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The court finds that a reasonable finder of fact could conclude that Plaintiffs have not met their burden of establishing that the practice of denying applications on demand and use of an application waiting list existed between January 10, 1998 and January 10, 2000, given the absence of any specific evidence that the Virgin Islands RD offices continued these practices or that any individual was denied an application upon request and/or was placed on an application waiting list.  Therefore, the court must grant Defendant's Motion for Summary Judgment on Count I as untimely.

---

> (1) deny the motion;
> (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> (3) issue any other just order.

Fed. R. Civ. P. 56(f).

[24] Plaintiffs have filed a 56(f) motion concerning Defendant's Motion for Summary Judgment as to Counts IV & V, the FHA and APA counts, which the court considers below.

2.      Evaluating the merits of Defendant's Motion for Summary Judgment on Count I.

Assuming, arguendo, that a reasonable fact-finder could conclude that Plaintiffs have established a genuine issue of material fact as to whether any alleged acts of discrimination arising under Count I occurred during the limitations period, the court will address Defendant's argument that there is no genuine issue of material fact that Defendant did not engage in a pattern and practice of intentional national origin discrimination in the use of an application waiting list.

In Count I, Plaintiffs allege that Defendant routinely denied Virgin Islanders access to applications for Sections 502 and 504 loans and, instead, forced prospective applicants to place their names on a "phony waiting list" in order to receive an application.  Plaintiffs contend that this practice was contrary to applicable regulations requiring the distribution of an application upon request and that this practice only occurred in the Virgin Islands.  On these bases, Plaintiffs conclude that Defendant utilized a practice that violated ECOA's prohibition against discrimination on the basis of national origin in any aspect of a credit transaction.

To evaluate the parties' motions for summary judgment on this count, the court must first determine whether the distribution of a loan application qualifies as an aspect of a credit transaction under ECOA.  15 U.S.C. § 1691(a).  Thereafter, the court will determine whether there is a genuine issue of material fact as to whether Defendant perpetrated a pattern and practice of intentional national origin discrimination against Plaintiffs in the administration of RD housing loan programs in violation of the non-discrimination provisions of ECOA.

a.     The failure to distribute loan applications or to accept completed loan
applications is conduct that qualifies as an aspect of a credit transaction
under ECOA.

Governing regulations define "credit transactions" as "'every aspect of an applicant's

dealings with a creditor regarding an application for credit or an existing extension of credit

(including, but not limited to, information requirements; investigation procedures; standards of

credit worthiness; terms of credit; furnishing of credit information; revocation, alteration or

termination of credit; and collection procedures).'"  Ordille, 216 Fed. Appx. 160, 164 (3d Cir.

2007) (quoting Garcia v. Johanns, 444 F.3d 625, 629 n.4 (D.C. Cir. 2006) (quoting 12 C.F.R. §

202.2(m))).  Defendant does not contend that the conduct alleged in Count I is not cognizable as

an aspect of a credit transaction under ECOA, and the court finds that Defendant's alleged failure

to distribute loan applications on demand and its implementation of a loan application waiting

list are aspects of a "credit transaction."

b.     Discrimination under ECOA.

Plaintiffs allege that Defendant perpetrated a pattern and practice of disparate treatment of

Virgin Islanders in its administration of RD housing loan programs by refusing to hand out loan

applications on demand and, instead, requiring people to add their names to a "waiting list" to

receive an application, and engaging in other actions designed to make it difficult, if not

impossible, for Virgin Islanders to obtain a housing loan from RD.  Plaintiffs move for summary

judgment on Count I.  Defendant moves for summary judgment on all three ECOA counts, and

argue that, even if the conduct that Plaintiffs allege did, in fact, occur, it does not constitute

discrimination on the basis of national origin.

There is limited case law concerning the non-discrimination provisions of ECOA. Several circuits have found it appropriate to import the analysis used in Title VII employment discrimination cases to ECOA cases involving discrimination.  See, e.g., Lewis v. ACB Bus. Servs., Inc., 135 F.3d 389, 406 (6th Cir. 1998) (adopting the same framework and burden allocation analysis as used in Title VII employment discrimination cases); Moore v. United States Dep't of Agric. Ex rel. Farmers Home Admin., 55 F.3d 991, 993 (5th Cir. 1995) (borrowing from Title VII case law to develop the elements of an ECOA prima facie case); Mercado-Garcia v. Ponce Fed. Bank, 979 F.2d 890, 893 (1st Cir. 1992); Bhandari v. First Nat'l Bank of Commerce, 808 F.2d 1082, 1100-01 (5th Cir. 1987); Williams v. First Fed. Sav. & Loan Ass'n, 554 F. Supp. 447, 448-4949 (N.D.N.Y 1981), aff'd, 697 F.2d 302 (2d Cir. 1982); but see Latimore v. Citibank Fed. Sav. Bank, 151 F.3d 712, 713-15 (7th Cir. 1998) (stating that use of McDonnell Douglas shifting burden in ECOA case unsuitable in certain credit cases lacking "competitive situations" and noting that Plaintiffs can "try to show in a conventional way, without relying on any special doctrines of burden-shifting, that there is enough evidence, direct or circumstantial, of discrimination to create a triable issue.").  The Third Circuit has not yet determined whether the body of Title VII employment discrimination case law, including the McDonnell Douglas[25] shifting burden framework for individual disparate treatment cases, provides a model that can be imported to the field of credit discrimination under ECOA.  Chiang II, 385 F.3d at 267.  Plaintiffs urge this court to adopt a similar approach in this matter, with no objection from Defendant.  This court agrees with the reasoning that it is appropriate to import the analysis from Title VII cases in analyzing a claim of discrimination brought under ECOA and

_____

[25] McDonnell Douglas v. Green, 411 U.S. 792 (1973).

will utilize Title VII employment discrimination case law as it may be appropriate in the context of credit transaction discrimination.

    i.  <u>Forms of discrimination in employment discrimination case law.</u>

  Traditionally, employment discrimination case law recognizes two forms of discrimination: disparate treatment and disparate impact.  <u>Healey v. Southwood Psychiatric Hosp.</u>, 78 F.3d 128, 131 (3d Cir. 1996).  A claim of disparate treatment encompasses a discriminatory, adverse action directed at an individual or group <u>because of</u>, not merely in spite of, a protected characteristic.  <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1274 (11th Cir. 2000) (quoting <u>Personnel Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979)).  A claim of disparate treatment requires proof of discriminatory intent, which is not required in a disparate impact claim.  <u>Int'l Bhd. of Teamsters v. U.S.</u>, 431 U.S. 324, 335 n.15 (1977) ("Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.")  A disparate treatment case may be brought on an individual or on a systemic level.  A systemic disparate treatment case is also known as a "pattern and practice" case.  <u>See, e.g.</u>, <u>Black v. The Premier Company</u>, No. Civ.A. 01-4317, 2002 WL 32122658, at *2 n.4 (E.D. Pa. Sept. 13, 2002) (quoting <u>Segar v. Smith</u>, 738 F.2d 1249, 1266 (D.C. Cir. 1984)).  In a pattern and practice case, the plaintiff must prove that discrimination is the company's "standard operating procedure."[26]  <u>Teamsters</u>, 431 U.S. at 335-36.

  A disparate impact theory of discrimination prohibits "practices that are fair in form, but discriminatory in operation."  <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 431 (1971); <u>see also</u>

---

[26] This is different from a plaintiff's burden in an individual disparate treatment case.

Teamsters, 431 U.S. at 335 n.15 (stating that disparate impact claims "involve employment practices that are <u>facially neutral</u> in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity" and do not require "[p]roof of discriminatory motive.") (emphasis added); <u>Joe's Stone Crab</u>, 220 F.3d at 1267 (disparate impact claim requires "the identification of a specific, facially-neutral employment practice causally responsible for an identified statistical disparity.").

The distinction between a systemic disparate treatment claim and a disparate impact claim is sometimes blurred, particularly as both claims occasionally arise in the same litigation, and sometimes even on the same facts.  See <u>Reap v. Continental Casualty Company</u>, 199 F.R.D. 536, 543 (D.N.J. 2001).  As each theory of discrimination requires significantly different proof and different analysis, the court must determine under which theory Plaintiffs have chosen to pursue their ECOA claims.

> ii.   <u>The court will consider Plaintiffs' claims of discrimination as</u>
> <u>arising under a pattern and practice theory of discrimination.</u>

The thrust of the class allegations of discrimination, as found in Plaintiffs' First Amended Complaint, is that Defendant intentionally discriminated against Plaintiffs because they are Virgin Islanders.[27]  (<u>See, e.g.</u>, Pls.' First Amend. Compl. ¶¶ 21, 22, 23-25, 32, 33, 35, 45, 54, 138, 165.)  Central to all of Plaintiffs' class discrimination allegations is that Defendant utilized a "phony" application waiting list rather than distributing loan applications upon request and that

---

[27] The claims as pled in the First Amended Complaint also allege discrimination on the basis of race and gender.  As the Third Circuit made clear in <u>Chiang II</u>, the class is only certified with respect to claims of discrimination on the basis of national origin.  <u>Chiang II</u>, 385 F.3d at 268-69.

this was done only in the Virgin Islands.  See Chiang II, 385 F.3d at 260.  Chiang II understood

Plaintiffs' class claims to be framed as disparate treatment, or intentional discrimination, claims

and recognized that "plaintiffs' primary claim is that they were discriminated against for being

Virgin Islanders."  Chiang II, 385 F.3d at 262; see also Chiang II, 385 F.3d at 259 (outlining

requirements for a prima facie case of disparate treatment).  Further, in their brief in support of

their Motion for Summary Judgment, as well as throughout other briefing and oral argument,

Plaintiffs contend that only in the Virgin Islands were individuals systematically denied an

application upon request and was an application waiting list of this type used.[28]  (Pls.' Mem.

Supp. Mot. Summ. J. 17.)  Plaintiffs have argued that the practice of keeping an application

waiting list, as well as other actions and policies that they describe as Defendant's "highway to

nowhere" and "impossible yes" schemes, were discriminatory because they only utilized in

the Virgin Islands.

        To counter Defendant's arguments that summary judgment is appropriate because

Plaintiffs cannot establish discriminatory intent, Plaintiffs argue that discriminatory intent is not

necessary to prove discrimination under ECOA, and that proof of discriminatory effect is

sufficient.[29]  Disparate impact liability, however, "involves employment practices that are facially

---

        [28] In addition, in their response in opposition to Defendant's Motion for Summary
Judgment, Plaintiffs again allege that Defendant engaged in "disparate treatment of Virgin
Islanders" and a "pattern and practice of unlawful discriminatory conduct in the Virgin Islands."
(Pls.' Opp Def.'s Mot Summ J. 10, 14.)

        [29] It appears that Plaintiffs, during briefing and oral argument, have conflated the theories
of disparate treatment and disparate impact.  For example, during oral argument, Plaintiffs'
counsel argued that "ECOA doesn't require any intent.  All it requires is a discriminatory effect."
(Oral Arg. Tr. 52, May 25, 2007.)  Counsel, however, also argued that "All [ECOA] requires is
that somebody be treated less favorably because of their national origin or their race or their
religion or their sex."  (Id. (emphasis added).)  The phrase, "because of" is indicative of

neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 726 (3d Cir. 1995) (quoting Teamsters, 431 U.S. at 335 n.15).

It is clear that Plaintiffs' claims all come under the theory of disparate treatment, not disparate impact.  Plaintiffs allege that they were treated differently because they were Virgin Islanders.  (See, e.g., Pls.' Opp. Def.'s Mot. Summ. J. 11 (alleging Defendant "targeted" Virgin Islanders).)  Plaintiffs do not identify a facially-neutral policy or practice that they credit with having a disparate adverse impact on Virgin Islanders as compared to non-Virgin Islanders.  A policy that is applied only to a protected group is not a "facially-neutral" policy for the purposes of advancing a disparate impact claim.  Plaintiffs allege that they were subjected to certain requirements, actions and treatment to which non-Virgin Islanders were not subjected.  The court must conclude, therefore, that this is not pled as a disparate impact case.

iii.     Proving a claim of a pattern and practice of discrimination.

In International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977), the Supreme Court outlined the burdens of proof of each party in a systemic disparate treatment case.[30]  The plaintiff bears the initial burden of making out a prima facie case of discrimination,

---

discriminatory intent.

[30] The McDonnell Douglas/Burdine four-part test for establishing a prima facie case of discrimination in individual disparate treatment cases is not applicable in pattern and practice cases.  Reap v. Continental Casualty Company, 199 F.R.D. 536, 542 (D.N.J. 2001).  In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973), the Supreme Court outlined a four-part test for plaintiffs to establish a prima facie case of discrimination in the absence of direct evidence.  A plaintiff must establish that 1) Plaintiff belongs to a protected class, 2) Plaintiff applied and was qualified for a job for which the employer was seeking applications; 3) despite his/her qualifications, s/he was rejected; and 4) after his/her rejection, the position

that is, of establishing "by a preponderance of the evidence that [national origin] discrimination was the [defendant's] standard operating procedure – the regular rather than the unusual practice." Id. at 336.  At this initial stage, plaintiffs' burden is to establish that a discriminatory policy or procedure was in place and they are "not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy."[31] Id. at 360 (emphasis added).

If the plaintiffs do establish a prima facie case, the burden shifts to the defendant "to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant." Id. at 360; see also Croker v. Boeing Co., 662 F.2d 975, 991 (3d Cir. 1981) (defendant may rebut inference of discrimination "by showing that the statistics are misleading or inaccurate.")  In some instances, a defendant may meet its burden by providing a "nondiscriminatory explanation for . . . apparently discriminatory result[s]." Teamsters, 431 U.S. 360 n.46; see also Croker, 662 F.2d at 991 (defendant may rebut an inference of discrimination "by presenting legitimate, nondiscrimatory reasons for the

---

remained open and the employer continued to seek applications from persons of the plaintiff's qualifications.  In individual disparate treatment cases, a plaintiff has the burden of proving, by a preponderance of the evidence, a prima facie case of discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citing McDonnell Douglas, 411 U.S. at 802).  Next, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." Id. (citing McDonnell Douglas, 411 U.S. at 801).  The Supreme Court has emphasized that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff. Id. (citing McDonnell Douglas, 411 U.S. at 802).  This ultimate burden remains with the plaintiff in a pattern and practice case as well.

[31] In addition, the Supreme Court has emphasized that in "Title VII pattern or practice suits, question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination." Id. at 362.

disparity.").  Defendant's burden is one of production, not persuasion.  Croker, 662 F.2d at 991.

Finally, should Defendant rebut Plaintiffs' prima facie case of discrimination with legitimate, non-discriminatory reasons, Plaintiffs must prove that such reasons are pretextual. See Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) ("to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions."); Croker, 662 F.2d at 991.

Plaintiffs always carry the burden of persuasion that the defendant "had a policy, pattern, or practice of discriminating against a protected group."  Black, 2002 WL 32122658, at *2 (internal citations omitted).  To prove discriminatory intent, a plaintiff must demonstrate "'that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects on an identifiable group."  Joe's Stone Crab, Inc., 220 F.3d at 1274 (internal citations omitted).  To establish their burden of proof, plaintiffs frequently use circumstantial evidence such as statistical evidence and individual testimony of specific instances of discrimination.  See, e.g., Teamsters, 431 U.S. at 338-39; see also Reap, 199 F.R.D. at 542 (noting that the statistical evidence aims to establish "the defendant's past treatment of the protected group"); Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-08 (1977); Lex K. Larson, Employment Discrimination § 9.03[1] (2d ed. 1975).

c.   <u>Plaintiffs have not produced sufficient evidence to establish a prima facie case of a pattern or practice of  national origin discrimination.</u>

Plaintiffs contend that Defendant maintained a long-term, consistent and systematic policy of refusing to give out Section 502 and 504 loan applications to Virgin Islanders and instead placed their names on a "phony" application waiting list for the distribution of loan applications.  In addition, Plaintiffs argue that the following related practices, when considered as a whole, constitute a pattern and practice of discrimination on the basis of national origin against Virgin Islanders, in violation of ECOA, 15 U.S.C. §§ 1691 <u>et seq.</u>: the distribution of loan applications in a different order than the order of the names on the waiting list; the failure to process and consider completed loan applications in the order in which names appeared on the waiting list; that some individuals were able to obtain a loan application immediately; and that some individuals who requested loan applications were never even added to the waiting list purportedly because of its length.  (<u>See generally</u> First Amend. Compl.; Pls.' Mot. Summ. J.) Plaintiffs contend that the RD officials in the Virgin Islands, and in the administrative offices in New Hampshire and Vermont, instituted and knew of the practice of refusing to provide loan applications upon request.  Finally, Plaintiffs argue that in no other location in the United States were individuals systematically denied a loan application upon request by their local RD office or was an application waiting list utilized.  Plaintiffs assert that this practice of use of an application waiting list is direct evidence of a pattern and practice of national origin discrimination.  (Pls.' Resp. Opp. Def.'s Mot. Summ. J. 16.)

Defendant does not contest that some type of waiting list was used by the Virgin Islands' local RD offices with respect to housing loan applications.  Defendant, however, argues that

there is no evidence of discriminatory intent in the use of any waiting list and that Plaintiffs

cannot meet their burden to establish a case of national origin pattern and practice discrimination.

The court will begin by reviewing the evidence submitted about the use of an application

waiting list in Virgin Islands local offices.

i.   <u>There is evidence that an application waiting list existed.</u>

It is undisputed that during at least some portion of the nineteen years at issue, the Virgin

Islands local offices utilized a waiting list on which individuals' names and contact information

were kept.  Further, there is undisputed evidence that at some point during the relevant time

period, the local RD offices stopped handing out loan program applications upon request and

instead used the waiting list instead of automatically handing out a loan application to every

person who requested one or who made an inquiry as to RD housing loan program.  It is disputed

whether more than one type of waiting list was kept by the RD offices, whether one was kept for

the purpose of keeping track of individuals to be called to attend an informational group meeting,

and another for individuals to be contacted when applications would be "available" to them.

The record includes the deposition testimony of several individuals who either worked in

the local RD office or who were officials in the state office, or who otherwise had contact with

the local office.[32]  Many of the details concerning the waiting list, or lists, are either vague in the

record or are disputed.  The record evidence suggests that at some point in the St. Croix RD

_____

[32] There is record evidence that the application waiting list was used in the St. Thomas
RD office as well as the office in St. Croix.  (<u>See, e.g.</u>, Def.'s Mem. Supp. Mot. Summ. J. Ex. 5,
Ramos Dep. 33, August 15, 2006 (stating that the waiting list was in place in the St. Thomas
office when he arrived there in 1991.)  The vast majority of the record evidence, including a copy
of what is represented to be the waiting list itself, concerns the St. Croix office, and as a result,
the court will frequently refer to that office only.

office, there existed a "group meeting list" that was used to organize interested individuals to attend a group informational meeting, and that this list that morphed into a waiting list to receive an application, that is, that individuals had to put their name and contact information on the list in order to "line up" to receive a loan application, as alleged by Plaintiffs.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 11, Rosa Dep. 60-61, 68, April 26, 2006; see also Def.'s Mem. Supp. Mot. Summ. J. Ex. 15, Roderick Dep. 21, July 13, 2006 (stating that the group meeting waiting list was the same as the application waiting list).)  Some of the record testimony describes the waiting list as a home buyer education list, while other testimony describes it as an application waiting list.  (See, e.g., Def.'s Mem. Supp. Mot. Summ. J. Ex. 21, Nichols Dep. 42, August 18, 2006 (stating that he was told by some people that the list was a home buyer education list and others told him that it was an application waiting list).  However, all the evidence shows that only one "waiting list" existed at any one time.  (See, e.g., Def.'s Mem. Supp. Mot. Summ. J. Ex. 10, William Greenidge Dep. 38, May 10, 2006; Rosa Dep. 96; Def.'s Mem. Supp. Mot. Summ. J. Ex. 14, Cintron Dep. 41, May 2, 2006.)

Several St. Croix RD employees testified that it was Russell Higgins, whom they identified as the Vermont State Office Housing Chief,[33] who directed the local RD office to utilize an application waiting list to take the names of people who wanted a loan application. (Williams Greenidge Dep. 35-37; Def.'s Mem. Mot. Summ. J. Ex. 17, Keller Dep. 27, June 16, 2006.)  Higgins described the Virgin Islands as a "high volume application jurisdiction."  (Def.'s

---

[33] During his deposition, Higgins stated that he became Chief of Rural Housing in the Vermont Office sometime after Hurricane Hugo, but that he worked with the Virgin Islands RD programs in his capacity as housing specialist in the Vermont RD State Office prior to becoming Chief.  (Higgins Dep. 14-17, 30.)

Mem. Supp. Mot. Summ. J. Ex. 4, Higgins Dep. 32, July 12, 2006.)  He stated that he and his office took measures to get the situation under control.  (Id. 30-34.)  He did not characterize any of these measures as a "waiting list" but explained that keeping a list of inquiries was a way to track who contacted the local RD office and in what order, and that this would determine the order in which applications were processed, not the date a completed application was submitted. (Id. 32-33.)

Higgins specifically testified that a similar mechanism was used in other local RD offices, specifically those located in New Hampshire and Vermont.  (Id. 37-38.)  Keller also believed that the local RD office in Epping, New Hampshire used a waiting list for loan applications.  (Keller Dep. 72-73.)  Everett Bailey, an official in the New Hampshire/Vermont state office, testified that "inquiry lists" were used in several local offices in New Hampshire to track individuals who were interested in home ownership, but that if someone "asked for an application, they would receive an application."  (Def.'s Mem. Supp. Summ. J. Ex. 20, Bailey Dep. 82, 83-85, July 17, 2006.)  Bailey acknowledged that if an RD office refused to give out an application upon request, it would be against regulations.  (Id. 82.)

Plaintiff has produced the testimony of many persons who state that they requested an application from RD during the relevant time period, were not given an application, but, instead, were added to a waiting list.  Whether this sequence of actions amounted to refusal is subject to debate.  (See, e.g., Def.'s Mem. Supp. Mot. Summ. J. Ex. 62, George Dep. 10, April 25, 2006 (stating that when she asked for an application, she was told that there were no applications and there was no funding); Def.'s Mem. Supp. Mot. Summ. J. Ex. 58, Carr Dep. 11-12, April 12, 2005 (stating that she requested an application and was told to add her name to a list and that

they would contact her when applications became available); Pls.' Mot. Summ. J. Ex. 1, Blyden
Dep. 10, May 1, 2006 (stating that in 1986 she went to RD and requested an application for a
mortgage and was told that they were not giving out applications and that she added her own
name to a list); Pls.' Mot. Summ. J. Ex. 4, Caroll Dep. 12-13, 15, April 26, 2006; Pls.' Mot.
Summ. J. Ex. 7, Christopher Dep. 12, April 13, 2005 (stating that in 1984 she went to St. Croix
RD office and requested an application for housing assistance, but was told that she had to put
her name on a list); Pls.' Mot. Summ. J. Ex. 10, Collingwood Dep. 11, May 8, 2006 (stating that
she tried to obtain an application in 1995 but was told to put her name on a waiting list); Pls.'
Mot. Summ. J. Ex. 11, C. Daniel Dep. 12, May 9, 2006 (name placed on waiting list in 1997);
Pls.' Mot. Summ. J. Ex. 12, J. Daniel Dep. 9-10, May 12, 2006 (name placed on waiting list in
1984 and in 1992 when he requested an application for a loan); Pls.' Mot. Summ. J. Ex. 18, Gore
Dep. 11-13, May 1, 2006 (requested application and name was placed on list in 1990); Pls.' Mot.
Summ. J. Ex. 19, Herbert Dep. 12, April 27, 2006 (name was placed on list in 1984 after she was
told that there was a backlog of names); Pls.' Mot. Summ. J. Ex. 21, John Dep. 11, May 3, 2006
(was told that they did not have any applications at the moment and her name was placed on the
waiting list in January 1981 but she received an application one month later); Pls.' Mot. Summ.
J. Ex. 28, Rawlins Dep. 16, April 11, 2005 (was placed on the waiting list in March 1991); Pls.'
Mot. Summ. J. Ex. 29, G. Rivera Dep. 13-14, May 3, 2006 (when he inquired about RD
programs, he was told that the procedure was to have his name placed on the list and that he
would be contacted later); Pls.' Mot. Summ. J. Ex. 34, Yearwood Dep. 12, 16, April 15, 2005 (in
1981 she and her husband attempted to apply for a Housing Loan but did not receive an
application and their names were placed on a list and received an application in 1982); Pls.' Mot.

Summ. J. Ex. 33, S. Williams Dep. 9-10, May 5, 2006 (attended group meeting in 1987 or 1988 and she requested an application at the end of the meeting but was told that they were out, and she did not follow up).)  Plaintiffs have also produced evidence of members of the class who did receive applications.  (See Pls.' Mot. Summ. J. Ex. 30, M. Rivera Dep. 10-11, April 26, 2006 (she accompanied Frederick Freeman to RD office where he obtained a loan application, although in a prior year he was placed on the waiting list); Pls.' Mot. Summ. J. Ex. 32, L. Williams Dep. 11, May 5, 2006 (requested and received a loan application from RD); Pls.' Mot. Summ. J. Ex. 13, Dublin Dep. 10-11, April 13, 2005 (stating that in 1983 when she went to RD to apply for a loan, she was first told that she was supposed to be placed on an application waiting list, but she received an application in spite of that statement).)  Some individuals whose names were placed on the waiting list eventually received applications.  (See, e.g., Pls.' Mot. Summ. J. Ex. 26, Oliver Dep. 22, April 13, 2005 (received a loan application in the summer of 1994).)

There is substantial evidence that the implementation of, or switch to, an application waiting list occurred in close proximity to devastating Hurricane Hugo in 1989.  (See, e.g., Williams Greenidge Dep. 35 (testifying that she became aware that applications were not being given out on demand after Hugo, around 1990); see also Cintron Dep. 37, 40, (testifying that a group meeting list existed when she arrived in 1989, but at some point that list became "continuous.")  However, several persons testified that they were denied an application and placed on a waiting list prior to 1989.  (Dublin Dep. 10-11 (stating that in 1983 when she went to RD to apply for a loan, she was first told that she was supposed to be placed on an application waiting list, but she received an application in spite of that statement); Yearwood Dep. 12, 16 (in

1981 she and her husband attempted to apply for a housing loan but did not receive an application and their names were placed on a list and they then received an application in 1982); S. Williams Dep. 9-10 (attended group meeting in 1987 or 1988 and she requested an application at the end of the meeting but was told that they were out, and she did not follow up).)

The list used in the St. Croix office was kept in a folder under the counter and it was maintained and used by various office members.  (Williams Greenidge Dep. 38; Rosa Dep. 96; Cintron Dep. 41.)  Prospective applicants were directed to leave their contact information. (Williams Greenidge Dep. 36.)  This list contained the names of individuals as well as their contact information, including mailing address and phone number.  (Rosa Dep. 81.)  Many St. Croix local office employees knew that the waiting list was not "standard."  (See, e.g., Cintron Dep. 63 ("It was known that [the waiting list] wasn't standard.  In other words, it's not the way business was done in other offices.  But it was also noted that other offices didn't have the demand that we did."); Keller Dep. 28-29 (acknowledging that there was a discrepancy between the regulations and the direction from the Vermont State Office).)

The evidence suggests several reasons that the Vermont Office gave for the use of an application waiting list.  Higgins told Keller that it was "unmanageable to maintain a number of applications on hand that would be received as a result of obtaining applications from every individual."  (Keller Dep. 27.)  Local office managers gave employees reasons for the implementation of the application waiting list, including that the Vermont office indicated that there was no funding.  (Rosa Dep. 78-79).  Local RD employees and officials gave several reasons to prospective applicants to explain why they had to put their name on the waiting list: (1) that there were no funds available (Williams Greenidge Dep. 36; Caroll Dep. 15; Pls.' Mot.

Summ. J. Ex. 6, Christian Dep. 15, May 3, 2006; John Dep. 17 (told that there was no money when she turned her application in February 1981)); (2) that applications were unavailable (Pls.' Mot. Summ. J. Ex. 25, Nicholas Dep. 13, April 25, 2006; Oliver Dep. 11; Pls.' Mot. Summ. J. Ex. 9, Clouden Dep. 8, 12, April 27, 2006 (stating that the first time she tried to obtain, and was denied, an application was in 1983); J. Daniel Dep. 10; Pls.' Mot. Summ. J. Ex. 20, Hunt Dep. 15, May 12, 2006; Pls.' Mot. Summ. J. Ex. 23, R. Johnson Dep. 10, April 15, 2005 (placed on the waiting list in 1991 or 1992 and received a notification of a group meeting which she attended in 1994 and received an application); and (4) that it was necessary to first attend a meeting prior to receiving an application.  (See e.g., Pls.' Mot. Summ. J. Ex. 16, Gomes Dep. 13-14, April 12, 2005 (Gomes testified that she was told about this meeting in 1982 when she went to apply for a loan, and that she was told that they would let her know when the meeting would be held.).)

It is disputed whether applications were ever given out on demand after the application waiting list came into existence.  There is evidence that some individuals were given applications as they requested them, even before attending a group meeting.  (See, e.g., Rosa Dep. 64.)  Once an individual did receive a loan application, there were out-of-pocket expenses related to the completion of the application.  For example, an applicant was required to obtain a credit report, at his or her own expense. (Higgins Dep. 35.)  Further, if an application was more than 90 days old by the time it was processed, an applicant would be required to obtain an updated credit report.  (Id. 36.)

Periodically, individuals on the waiting list were contacted by RD office employees and were told that RD was ready to take an application from them, but that they were first required to

attend a group information meeting.  (Williams Greenidge Dep. 39.)  Theoretically, these

informational meetings were to take place every month, but there were sometimes gaps when no

meetings were held, including following Hurricane Hugo[34] in 1989 and Hurricane Marilyn[35] in

1995.  (Cintron Dep. 59-60; Williams Greenidge Dep. 39-41, 44 (no meetings were held for

approximately one year after Hugo); Def.'s Mem. Supp. Mot. Summ. J. Ex. 13, Norberg Dep. 66,

76, June 13, 2006 (no group meetings were held for approximately one year after Hugo.).)

RD staff and officials did not make any efforts to keep the contact information on the

waiting list up-to-date.  (Keller Dep. 27.)  Staff attempted contacts of the individuals on the list

by the phone numbers written there.  (Keller Dep. 70-71.)

The local RD office was directed to stop using the waiting list by Florida State Office

employees after the Florida office assumed control of the Virgin Islands RD office in June 1997.

(Def.'s Mem. Supp. Mot. Summ. J. Ex. 22, Bryant Dep. 26, August 18, 2006; Nichols Dep. 42-

43; see also Williams Greenidge Dep. 51; Rosa Dep. 79.)  The Florida State Office directed the

local Virgin Islands RD office to give out applications and to process applications that they

received "right away."  (Williams Greenidge Dep. 52.)  Efforts were then  made to contact the

individuals whose names remained on the waiting list.  (Williams Greenidge Dep. 53; Def.'s

Reply Mem. Supp. Mot. Summ. J. Ex. 91, Bryant Dep. 21-22.)  These efforts included mailing a

letter to those individuals at the address on the waiting list to notify them they could into the

office to seek assistance or to file an application.  (Nichols Dep. 42, Bryant Dep. 21-23.)  It

cannot be ascertained what percentage of the individuals whose names appeared on the waiting

---

[34] Hurricane Hugo hit St. Croix on September 18, 1989.

[35] Hurricane Marilyn took place on September 15, 1995.

list were actually contacted.

Closely tied to the use of a waiting list was the practice of holding group informational meetings.  RD officials have testified that Vermont requested that the Virgins Islands RD offices hold group informational meetings and that that decision was implemented by local officials. (See Norberg Dep. 45 (Vermont requested the Virgin Islands hold group meetings, and Norberg understood group informational meetings to be standard practice in Vermont); Def.'s Mem. Supp. Mot. Summ. J. Ex. 12, Alling Dep. 45-49, June 7, 2006 (stating that as county supervisor he instituted group meetings as the result of discussions he had with the Vermont State Office for management purposes).)  At these meetings, RD employees provided information about the program to interested parties.  (Rosa Dep. 65.)  There is evidence that a list was used to keep track of individuals who were interested in attending group informational meetings and for the purpose of contacting those individuals to let them know when the next meeting would be scheduled.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 5, Ramos Dep. 46, Aug. 15, 2006 (waiting list in St. Thomas was often "cleared" due to frequent group meetings); Def.'s Mem. Supp. Mot. Summ. J. Ex. 9, Bryce Dep. 63, May 11, 2006; Williams Greenidge Dep. 39; Rosa Dep. 61.) Eventually, people's names were being added to the St. Croix list without any group meetings scheduled in the future because of high demand.  (Cintron Dep. 40.)  Several former RD employees stated that these meetings were to give the next group of individuals on the waiting list an opportunity to learn about the programs and to determine whether they wanted to proceed with an application.  (Cintron Dep. 43; Keller Dep. 32.)  Local RD staff, including Tyrone Molyneaux & Kristine Cintron, conducted these meetings.  (Keller Dep. 33; Cintron Dep. 58; Norberg Dep. 55.)  There is evidence that applications were handed out at the conclusion of these

meetings.  (Cintron Dep. 58.)  Frequency of meetings appears to have been discretionary.  Local official Keller testified that many factors went into determining how often to have meetings, including the status of the applications already on hand.  (Keller Dep. 33.)

There exist factual disputes concerning details about the use of an application waiting list, including when it came into effect, and its relationship to group informational meetings held by RD.  However, the court finds that these details do not rise to the level of material fact for the purpose of its determination of the summary judgment motions.  It is undisputed that the St. Croix local RD office had, at some point, a practice of maintaining a waiting list, by which it tracked interest in loan programs and that frequently, if not at all times that the waiting list was in place, individuals who requested an application or information from RD had their names and contact information added to the list, but received no application in the first instance.  It is further undisputed that this practice came into use as the result of a direction from Higgins, a Vermont RD State Office official, although the timing of that direction is not clear.  It is undisputed that, at times, some individuals on this list were contacted by the RD office.  Further, it is undisputed that some individuals whose names were placed on this list did receive loan applications.  It is undisputed that the local RD office was instructed to cease use of the application waiting list following the Florida State Office's assumption of management of the Virgin Islands RD offices, but it remains in dispute whether any local RD employee ever again added a name to the list or denied an application to an individual who requested one.

ii.     Evaluating Plaintiffs' evidence.

Plaintiffs argue that they have presented sufficient evidence to meet their burden of establishing an inference of national origin discrimination.  They argue that the mere existence of the practice of refusing to hand out applications, coupled with the use of an application waiting list, is sufficient direct evidence to establish national origin discrimination.  Plaintiffs also contend that they have submitted sufficient circumstantial evidence, in the form of the Report resulting from the 1997 investigative trip conducted by the USDA Civil Rights Office, the manner in which funding was allocated to the Virgin Islands RD programs, and anecdotal testimony, to establish an inference of national origin discrimination.  Defendant disagrees, and argues that Plaintiffs fail to meet their threshold burden.

A.     There is no direct evidence of discriminatory intent.

First, Plaintiffs argue that the undisputed refusal to hand out applications on demand and the use of an application waiting list were a direct violation of Defendant's own regulations,[36] a violation that occurred only in the Virgin Islands and that was necessarily discriminatory against Virgin Islanders.  Defendant, conceding only for purposes of the motions pending before the court, that the refusal to hand out applications upon request was contrary to regulations in place at the time the waiting list was in use, contends that, as a matter of law, national origin discriminatory intent cannot be inferred from its actions.

It is faulty legal reasoning that the failure to follow one's own regulations or internal procedure necessarily evidences discriminatory intent.  "[T]he mere fact that an employer failed

_____

[36] Plaintiffs cite to the following authority: 12 C.F.R. § 202.4; 7 C.F.R. § 3550.55; and RD Instructions 1910.2-1910.3.

to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." <u>Jones v. University of Pennsylvania</u>, No. CIV.A. 99-2695, 2003 WL 21652083, at *5 (E.D. Pa. March 20, 2003) (quoting <u>Randle v. City of Aurora</u>, 69 F.3d 441, 454 (10th Cir. 1995)).  In order to meet their burden, Plaintiffs, should they rely on the violation, must yet connect Defendant's failure to follow its regulations to national origin discrimination.

The court finds that even if an application waiting list only existed in the Virgin Islands, and even if only in the Virgin Islands did an RD office deny a loan application to an individual requesting one, Plaintiffs have not produced direct evidence of a nexus between the practice and the national origin discrimination that they allege.  No reasonable inference of intent to discriminate on the basis of national origin can be drawn solely from the fact that this practice was inconsistent with applicable regulations and occurred only in the Virgin Islands.  This is, in part, because of evidence that there were circumstances existing in the Virgin Islands, such as devastating hurricanes and extended periods of high loan delinquency, that did not exist in the other local offices supervised by the Vermont/New Hampshire State Office.

Having failed to present direct evidence of national origin discrimination, the question becomes whether Plaintiffs have produced circumstantial evidence to meet their burden.

        B.     <u>There is no statistical evidence from which discriminatory intent can be inferred.</u>

Plaintiffs argue that they have presented statistical evidence that 100% of Virgin Islanders were denied loan applications, while 0% of mainlanders were denied applications.  (Pls.' Opp.

Def.'s Mot. Summ. J. 16.)  This argument defies logic, as it begs of the question of how could Virgin Islanders possibly receive loans during the time period at issue if, in fact, 100% of Virgin Islanders were denied loan applications.  Further, even if by this argument Plaintiffs intend to argue that 100% of Virgin Islanders were placed on an application waiting list rather than given an application upon first request, such argument is not borne out by Plaintiffs' own allegations. Plaintiffs allege that not every Virgin Islander who requested an application was necessarily placed on the application waiting list; instead, some received loan applications.  (See First Amend. Compl. ¶ 45; Pls.' Mem. Supp. Mot. Summ. J. 17 ("A few people were able to avoid the 'waiting list' altogether and obtain an application immediately by knowing a RD official, or were surreptitiously given an application by local RD officials, while others could not even get on the 'waiting list' being told that it was simply too long."); see also Rosa Dep. 64; M. Rivera Dep. 10-11 (she accompanied Frederick Freeman to RD office where he obtained a loan application); L. Williams Dep. 11 (requested and received a loan application from RD); Dublin Dep. 10-11 (stating that in 1983 when she went to RD to apply for a loan, she was first told that she was supposed to be placed on an application waiting list, but she received an application in spite of that statement).)

There is no statistical evidence to suggest that the institution of an application waiting list had an impact on the number of completed loan applications filed with RD, processed by RD, or funded by RD.  Plaintiffs submit no statistical evidence of historical trends in the administration of the Virgin Islands RD loan programs.

The court finds that Plaintiffs have not presented any competent statistical evidence to establish an inference of national origin discrimination.  Although Defendant argues that such a

failure is fatal to Plaintiffs' case, the court concludes that statistical evidence, while frequently

central to establishing an inference of discrimination, is not absolutely required.  In fact,

"[s]tatistical comparisons, if they are to have any value, must be between comparable groups and

free from variables which would undermine the reasonableness of discrimination inferences to be

drawn."  Mazus v. Department of Transp., Com. of Pa., 629 F.2d 870, 875 (3d Cir. 1980) (citing

Swint v. Pullman-Standard, 539 F.2d 77, 97 n.50 (5th Cir. 1976)).

　　　　Plaintiffs argue that, because no other group was similarly situated to Virgin Islanders,

they cannot produce any meaningful statistical evidence.  Under Teamsters, Plaintiffs, first have

the burden of establishing an inference of national origin discrimination.  This may be achieved

through different types of circumstantial evidence depending on the specific facts of a case.

While cases cited by Defendant emphasize the importance of statistics in a pattern and practice

case, the court does not find that summary judgment must be granted in Defendant's favor simply

because Plaintiffs have not put into evidence statistical evidence supporting a conclusion that

national origin discrimination was the Defendant's usual practice.  The court will proceed to

evaluate all of the evidence in the record to determine whether Plaintiffs have met their burden.

　　　　　　　　　　C.　　The other circumstantial evidence produced by
　　　　　　　　　　　　　Plaintiffs does not support an inference that a
　　　　　　　　　　　　　pattern and practice of intentional national origin
　　　　　　　　　　　　　discrimination existed.

　　　　Other circumstantial evidence, including anecdotal testimony of discriminatory

statements, may be used by Plaintiffs to establish an inference of national origin discrimination.

See Teamsters, 431 U.S. at 338.  Plaintiffs offer the Report resulting from RD's 1997

investigation in St. Croix, the allocation of funds to the Virgin Islands, and anecdotal testimony

as evidence supporting their contentions.

Report from the July 1997 Civil Rights Investigative Trip

Plaintiffs argue that the Report of the Civil Rights Compliance Review for the Virgin Islands ("Report") supports an inference of national origin discrimination through the use of the application waiting list and failure to hand out loan applications upon request.  (See Pls.' Mot. Summ. J. Ex. 70, Report.)  As discussed above, several RD officials and representatives traveled to St. Croix in July 1997.  Though the trip was described as both a "compliance review" and as an "informal fact-finding trip," and the court will refer to it simply as an investigation.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 23, Prejean Greaux Dep. 106-107, June 14, 2006 (describing the trip as an informal fact-finding trip, not a compliance review); Report 1 (titled "Compliance Review").)

The record contains two documents that resulted from this investigative trip, and the court will evaluate both, along with the testimony of those involved in creating the documents or otherwise involved, to determine whether they constitute evidence of national origin discriminatory intent.

The first is a memo addressed to Prejean Greaux, "a summary of the notes taken during the July 14-17, 1997 visit to St. Croix."  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 26, On-Site Review.)  The memo stated that there existed a list of approximately 600 people who needed to take a homebuyers education class from the Housing Authority.  (Id. 7835.)  The On-Site Review acknowledges that this is "contrary to [RD] instructions."  (Id. 7835.)  This review concludes that "There were[sic] no clear evidence of purposeful discrimination on the part of Rural

Development in the administration of its 502 housing program.  All applicants appear to have been treated the same, whether or not processing was in accord with established Instructions." (Id. 7836.)  In her deposition Prejean Greaux testified that the basis of this conclusion was not that everyone in the Virgin Islands was being treated the same, but, rather, "there was nothing being done in the Virgin Islands differently than we did in the states."  (Prejean Greaux Dep. 161-62.)  The investigative team identified areas of concern and worked to effectuate changes. (Id. 162.)  Prejean Greaux had recommended that Florida take over from Vermont in supervising the Virgin Islands due to Florida's proximity, and because she thought that it was better managed than, for example, Puerto Rico.  (Id. 128-129.)  Although the review's conclusion of "no purposeful discrimination" was a legal one that cannot take the place of a court's analysis, it is observed that nothing in the review suggests there existed intentional systemic discrimination or discriminatory intent in the use of an application waiting list.

The second document is the unofficial Compliance Report ("Report").  (Report 006444.) The Report cannot be given evidentiary value because of declared deficiencies of competency made by the investigative team members themselves with respect to their investigative methodology as well as their understanding, or lack of understanding, of discrimination law.  A parsing of the Report demonstrates that, for all its verbiage, the Report does not assert a finding of intentional national origin discrimination.

First, the Report acknowledged RD's failure to provide loan applications to Virgin Islands residents until the summer of 1997, and explained that

> Instead, as instructed by the Vermont office, individuals were
> placed on a waiting list.  When the opportunity for loans became
> available, some on the list were contacted and given the

opportunity to complete an application.  <u>The list was used as a mechanism to keep track of individuals inquiring about home ownership and disaster loans.  The list was also used to select participants to participate in PFHP seminars.</u>  Seminars were conducted to explain the loan application process and to help the individuals selected off of the waiting list to complete the loan applications.

(Report 006445-006446 (emphasis added).)

It was further stated that the "review team believes, based on observation and interviews, that the waiting list was composed entirely of individuals from one of the protected classes." (Report 006446.)  Charles Morris, one of the members of the USDA investigative team, as well as one of the authors of the report, testified that the "protected class" referenced fell in the category of "national origin" but that that was "subject to debate."  (Pls.' Mot. Summ. J. Ex. 51, Morris Dep. 103, Dec. 6, 2006.)  When asked to specify to what national origin he was referring, he responded hesitantly: "Well, we were probably on a little bit, to be honest, probably on a little bit shaky ground saying that their national origin was African in descent from within a Virgin Islands base." (<u>Id.</u> 103.)  This "shaky" conclusion was based on team observation and interviews.  (<u>Id.</u> 103-104.)  Morris noted that "we did not personally encounter any white people that were on that list.  I have no reason to think there were not white people on the list, but we did not encounter any, as I recall, as we did our assessment."  (<u>Id.</u> 104.)  "National origin" referenced by Morris, appears to have been a hybrid of national origin (Virgin Islander) and race (black).[37]

---

[37] Although there exist Title VII employment discrimination cases in which courts have addressed discrimination on the basis of two protected classes, for example race and gender, the class here was certified only for national origin discrimination and this court is bound by that parameter.  <u>See, e.g.</u>, <u>Jefferies v. Harris County Community Action Ass'n</u>, 615 F.2d 1025, 1034 (5th Cir. 1980) (plaintiff alleged discrimination on the basis of race and sex, and the court stated

The Report concluded that "[a]ll individuals were systematically denied the opportunity to be considered for home ownership.  This is in direct violation of RD Instruction 1910." (Report 006446.)  In addition to discussing the waiting list and the failure to distribute loan applications, the Report discussed a pattern of practices it refers to as the "impossible yes."  The court will discuss this section in more detail below in conjunction with the ECOA counts specifically alleging discrimination through the "impossible yes."  (Id. 006446.)

Finally, the Report draws several conclusions about the significance of the practices of the local RD office:

> RD, while providing services to some segments of the VI, has demonstrated a pattern of behavior which has resulted in far more citizens being denied services and treated differently than called for by law and agency policy.  Race, gender and national origin are all found to be factors in this history.  This behavior over at least the past eight years fits the category best described as systemic discrimination and places the agency in substantial noncompliance with the appropriate laws and policies.  Specifically, RD has systematically discriminated against women, individuals based on race (Black) and persons based on their national origin.  Over a number of years individuals have been denied the benefits of services administered by the RD office.  Individuals were denied the opportunity to participate in the SFHP, placed on waiting lists, provided inferior service, and treated in a less than acceptable manner.  Because of this record, a remedial plan of action is required.

(Id. 06449.)  Again, the Report contained no explanation as to what "national origin" was referenced.

The Report cannot be legally regarded as a party admission of national origin discrimination by Defendant and no evidentiary weight can be given to its assertions or

---

that the "employer may not single out black women for discriminatory treatment.").

conclusions.  It is undisputed that the Report was never adopted by the USDA.  Defendant has

produced evidence that the Report was rejected because of its investigative deficiencies.  (See

Def.'s Mem. Supp. Mot. Summ. J. Ex. 28, Gray Dep. 108-109, August 24, 2006 (acknowledging

the delay of the release of several compliance and investigative reports and stating that, generally,

the reviewers had done an "inadequate investigation" and that the "facts were not sufficient for

them to reach the conclusions that they were drawing.").)  For example, the Report does not

provide explanation as to the basis of the conclusions of systemic discrimination.  The

investigation team itself acknowledged its limitations of legal understanding.  When questioned

about the composition of the investigative team, Morris testified that:

> [w]e would have been better served, the department would have
> been better served if we would have had greater competencies. . . .
> We had no difficulty affirming that what we reported that we found
> in the Virgin Islands is accurate.  It would have been better if we
> would have had access to or had involvement of greater expertise
> as to the meaning of what we found. . . . We concluded that what
> we found was discrimination.  I personally believe that it was.  I
> think the report would have been better served and we would have
> had greater certainty if we would have had a higher level of
> competence to have looked at what we found and made a
> determination with us that it truly was discriminatory.  I personally
> believed that it was, but I would have been more confident had we
> have had greater competency to assist us with that.

(Morris Dep. 77.)  Although Plaintiffs suggest malicious reasons for the decision not to adopt the

Report, there is no evidentiary basis for such an inference.  For these reasons, the Report cannot

be construed as a party admission of intentional national origin discrimination.

Further, the Report cannot be used fairly by Plaintiffs to raise an inference of systemic

intentional national origin discrimination by RD's use of an application waiting list.  No

statements made in the Report suggest national origin discriminatory intent.  Importantly, the

Report does not distinguish among protected classes, but broadly brushes that there had been discrimination on the basis of race, gender and national origin.  Therefore, for comparative purposes, it is not possible for anyone to separate out even undefined national origin from among the elements as they may have impressed the observations of the investigative team.  Further, the Report's statement that "RD, while providing services to some segments of the VI, has demonstrated a pattern of behavior which has resulted in far more citizens being denied services and treated differently than called for by law and agency policy" nevertheless recognized that there were Virgin Islanders who received services from RD.  (See Report 06449.)  Therefore, its statement cannot logically support a reasonable inference that there was intentional discrimination against all Virgin Islanders merely, because they were Virgin Islanders.  Finally, Morris' testimony contains no anecdotal evidence of discrimination.  When asked why he personally believed that RD's actions were discriminatory, Morris stated that people were denied service and opportunities.  (Morris Dep. 110.)  The court finds that none of Morris' testimony suggests or implicates any national origin discriminatory intent.  There is no legally cognizable basis in the Report, or in the testimony of any of the members of the review team, to support an inference of intentional national origin discrimination.

Plaintiffs also argue that the Report and other evidence suggest that there is conflicting testimony about if, and when, the waiting list was physically destroyed, and that such inconsistencies demonstrate a consciousness of guilt that the use of the waiting list was unlawful. This argument is without any support in the record.  Further, even if there was knowledge on the part of local and regional RD officials that use of the waiting list was inconsistent with or in violation of applicable regulations, this does not, as the court found above, lead, per se, to the

conclusion that Virgin Islander national origin discrimination was Defendant's regular practice and intent.

Allocation of funds

Plaintiffs offer several arguments regarding the impact of the application waiting list on the allocation of funds to the Virgin Islands' RD programs. Plaintiffs appear to make these arguments to counter Defendant's argument that the funding of RD programs in the Virgin Islands rebuts any inference of national origin discrimination, and not in support of a prima facie case of national origin pattern and practice discrimination.[38]

Anecdotal evidence

In support of their argument that they have established national origin discrimination, Plaintiffs offer the testimony of multiple Virgin Islands residents about their inability to obtain a loan application, and their experience with the application waiting list. (See, e.g., George Dep. 10; Carr Dep. 11-12; Blyden Dep. 10; Carroll Dep. 12-13.) This testimony, however, only establishes that residents were frequently unable to obtain an application upon request and instead had their names placed on an application waiting list. Plaintiffs have not produced any evidence that any Virgin Islander was told by RD officials or staff that she/he was not given an

---

[38] Should Plaintiffs argue that the allocation of funds to the Virgin Islands RD program was discriminatory, that claim would fail because nothing in the allocation of funds to the Virgin Islands RD program raises a reasonable inference of national origin discrimination or supports a finding that national origin discrimination was the standard practice of Defendant. The funding structure of RD programs in the Virgin Islands is discussed at length below.

application because they were a Virgin Islander.[39]  Plaintiffs' evidence is unlike the anecdotal

evidence presented in <u>Teamsters</u> in which individuals testified to over forty specific instances of

discrimination, including that they were specifically told, upon their application for a line-driver

job, that they were at a disadvantage because they were not white.  <u>Teamsters</u>, 431 U.S. at 338

n.19.  The fact of the matter, in the light most favorable to Plaintiffs, is that some Virgin

Islanders did not receive loan applications, while other Virgin Islanders did.  From that no

reasonable fact finder could infer national origin discrimination.

     Plaintiffs characterize the application waiting list as a "phony" waiting list, and argue that

individuals who did receive loan applications did not receive these applications in the order that

their names appeared on the waiting list, that applications were not processed in the order that

names appeared on the waiting list but in the order applications were received by Defendant, that

some people were on the list for years and never received an application, that Defendant never

contacted some of the people on the list, and that Defendant made no efforts to keep the contact

information on the waiting list current.  (Pls.' Mot. Summ. J. 5-6.)  These contentions, even if

substantiated, bolster the inescapable conclusion that Virgin Islanders, as a national origin class,

were not the victims of intentional discrimination.

---

[39] The record evidence is that the following reasons were given to prospective applicants explaining why they had to add their names to the application waiting list: (1) that there were no funds available (see, e.g., Williams Greenidge Dep 36); (2) that applications were unavailable (see, e.g., Nicholas Dep. 13); and (3) that it was necessary to first attend a group meeting (see e.g., Gomes Dep. 13-14.).

iii.    <u>Plaintiffs' evidence is not sufficient to meet its initial burden</u>.

Whether plaintiffs have established a <u>prima</u> <u>facie</u> case of intentional discrimination is a question of law for the court.  <u>Sarullo v. United States Postal Service</u>, 352 F.3d 789, 797 (3d Cir. 2003).  For the foregoing reasons, the court concludes that Plaintiffs have not submitted sufficient evidence that national origin discrimination was Defendant's standard practice by its use of an application waiting list and refusal to distribute applications on demand in the local RD office in St. Croix.

d.    <u>Defendant offers a legitimate non-discriminatory reason for the use of a waiting list in the Virgin Islands and that reason has not been rebutted by Plaintiffs.</u>

Even if the court were to find that Plaintiffs have established a <u>prima</u> <u>facie</u> case of national origin discrimination in the Defendant's use of an application waiting list in the Virgin Islands RD offices, the court finds that Defendant has fully rebutted this inference of discrimination by providing a non-discriminatory reason for its practice – that the waiting list was implemented for organizational and office management purposes.  Plaintiffs have not produced any evidence that suggests that those reasons are pretextual.  In addition, Defendant has produced evidence that Defendant allocated loan monies to the Virgin Islands pursuant to a uniform formula and that in the majority of the years at issue, all of the allocations were disbursed to Virgin Islanders.  In the four years of the relevant period when not all allocated monies were utilized, the monies returned to a common fund at USDA and were reallocated according to a statutory formula, and the Virgin Islands again received its <u>pro</u> <u>rata</u> share, which went solely to the benefit of eligible Virgin Islanders.

i.    Defendant has produced evidence that the application waiting list
was implemented and utilized for organizational purposes.

Defendant submits evidence that the use of a waiting list, in combination with group informational meetings, was for organizational purposes to benefit both prospective applicants and RD office staff in light of high demand as well as limited funding and staff resources.

First, the unrebutted evidence is that there was a high loan delinquency rate of RD loans in the Virgin Islands during the 1980s and that this created special circumstances.  (See, e.g., Alling Dep. 36, June 7, 2006 (stating that when he became a supervisor in the St. Croix office there was a delinquency rate of approximately 40% of the portfolio of 502 and 504 loans); Norberg Dep. 32 (Rate of nonpayment of loans was over 30% in 1986).)  As a result, there was a focus on collection of payment for existing loans in the 1980s.  (Norberg Dep. 34; see also Alling Dep. 47-48 (no initial 502 loans were being made because the St. Croix office was "attempting to get the caseload under control.")  Higgins testified that the delinquency of loans in the Virgin Islands was a matter that required special attention until it was brought under control.[40]  (Higgins Dep. 21-22.)  Higgins acknowledged that the demands of servicing of existing loans, at least at the beginning of his tenure working with the Virgin Islands, diverted resources from loan making.  (Higgins Dep. 21-22.)

Second, there is unrebutted evidence that the application waiting list and group

---

[40] Higgins also testified that prior to Vermont's supervision of the Virgin Islands, the New Jersey State Office managed the Virgin Islands local RD offices, and that New Jersey had a "total emphasis" on "loan servicing" to the detriment of staff time spent on loan making.  (Higgins Dep. 24-25.)  As a result, Higgins testified loan making had essentially stopped in the Virgin Islands under New Jersey's supervision.  (Higgins Dep. 24-25.)

informational meetings were measures implemented for organizational purposes in the face of high demand for loan making and loan servicing.  (See, e.g., Higgins Dep. 26-27 (measures implemented in the Virgin Islands were similar to measures he had implemented in Concord, New Hampshire, which had successfully decreased loan delinquency rates).)  Higgins testified that if such a system had not been implemented, "we would fail to function is basically what would happen.  We would lose control of our loan making and probably loan servicing because we would be so inundated . . . the staff would become totally unproductive. . . . That pretty much happened in the Virgin Islands right after . . . Hugo.  We had such a high demand that we had to come up with something that was efficient, fair, equitable and in accordance with our regulations."  (Higgins Dep. 42; see also Keller Dep. 27 (Higgins told Keller that it would be unmanageable to maintain the number of applications that would result if every individual who inquired received an application and submitted it).)  Several of the officials involved in implementing the waiting list intended for applications to be processed in the order that names appeared on the waiting list, not in the order applications were received, so that there would have been no disadvantage to not receiving an application when first requested.  An application would be completed once an individual's name came to the top of the list.  (Higgins Dep. 35, Keller Dep. 29.) For each paper application filed with the local RD office, however, RD staff had to create and maintain a file for each applicant, and "for those applicants that demanded to file an application and proceed along that line, it created a huge paper burden on the field officers in St. Croix and St. Thomas."  (Higgins Dep. 36.)

Third, there is evidence that the practice of holding group meetings and of using a list to track interest in RD loan programs was intended by Vermont officials to mimic successful

management tools implemented in New Hampshire.  Higgins testified that five local RD offices under the supervision of the Vermont State Office used a system where a "list" or "management cards" were used to track applicants and prospective applicants.  (Higgins Dep. 38-41.)  Joanne Black, an RD official who had formerly worked in the Epping, New Hampshire local office and then in St. Thomas, testified that the waiting list in St. Thomas was, at most, twenty-five names long, which she characterized as similar to the length of the lists in Epping and Concord, New Hampshire.  (Black Dep. 27.)  The stated intent of several Vermont officials was to duplicate what was done in the other jurisdictions, and that was how it started out.  The implementation in the Virgin Islands, particularly in St. Croix, however, became jumbled and inconsistent, but there is no evidence that it did so because of intentional national origin discrimination.[41]  These "inconsistencies" include the failure to hand out an application.  Vermont officials testified that in other jurisdictions, applications were handed out on demand if requested.  (See, e.g., Bailey Dep. 81 (stating that, in reference to the local RD offices in New Hampshire "Never in my career have I ever known of anyone that refused to give an application to anyone that requested one."); Higgins Dep. 48 (if an individual "absolutely demanded" an application she/he received one).) The only reasonable conclusion is the jumbled inconsistencies resulted from negligence and/or incompetence, which cannot be equated with intentional national origin discrimination.  There is also significant record evidence that, although officials located in Vermont directed the use of group informational meetings and the use of a waiting list tracking system, the practice regarding holding back applications was implemented by local officials.  For example, local supervisor

---

[41] Even Mike Espy, Plaintiffs proposed expert, characterized the use of an application waiting list as an ineffective "Band Aid" device.  (Pls.' Mot. Summ. J. Ex. 73, Expert Report of Mike Espy 5, October 13, 2006.)

Norberg testified that although the Vermont office requested that the local Virgin Islands office conduct group meetings, he made decisions about how to implement that directive.  (Norberg Dep. 45.)  Norberg testified that he was told to hold group meetings and that he figured out a way of doing so.  (Id. 71.)  Specifically, Norberg testified that no Vermont official told him not to give out applications until the end of a group meeting, and then only if an attendee specifically asked, but that rather it was a decision he had made and which he implemented.  (Id. 45.)  He explained his reasoning, stating that "It would defeat the purpose of a group meeting to give an application out before the meetings."  (Id. 45.)  Similarly, concerning the application waiting list, Williams Greenidge testified that Higgins did not say exactly how that list was to be kept or what was to be done with it, and that "[w]e had to come up with a decision on how to keep records of people that came in and requested applications."  (Williams Greenidge Dep. 37.)  Prolonged, extraordinary emergency conditions imposed by Hurricane Hugo in St. Croix and by Hurricane Marilyn in St. Thomas, discussed in greater detail below, are a factor to be considered to mitigate against the assignment of the seemingly haphazard administration in St. Croix, and to a lesser degree, St. Thomas.

Fourth, there is unrebutted evidence that RD officials articulated their belief that a waiting list and a delay in the distribution of loan applications would reduce the burden on applicants themselves in the face of limited loan funds.  A credit report, for which an applicant would have to pay, was required as a part of every complete loan application, as was an employment verification.  (Higgins Dep. 35.)  If an application was more than 90 days old, however, when it reached the front of the line for processing, a new credit report and employment verification had to be obtained and processed, at the expense of the applicant.

(Higgins Dep. 36.)  Higgins testified at his deposition that keeping a list and holding back applications benefitted prospective applicants who might undergo a change in circumstances that would impact their eligibility for a loan between the time of initial inquiry and when their name rose to the top of the list.  (Higgins Dep. 36.)  There is additional evidence that Vermont RD officials and local RD employees felt that group informational meetings benefitted prospective applicants by providing information about RD programs and their requirements prior to the distribution of loan applications.  (See, e.g., Higgins Dep. 34; Cintron Dep. 43; Ramos Dep. 46-49.)

The reasons stated to local RD employees by Vermont RD officials for the use of a waiting list articulate Defendant's present contention that the list was implemented solely for management purposes, that is, for non-discriminatory permissible purposes.  (See e.g., Keller Dep. 27 (told by Vermont office that list would help manage applications and interest in RD programs); Pls.' Mot. Summ. J. Ex. 58, Rosa Dep. 71, April 28, 2006 (stating that "I was told that the state office of Vermont said that there was no funds for the VI and that we should – it didn't make sense to give out the application because there's no monies to give, you know, why make people waste their time filling out an application.  That's basically what I understood from what was told, you know, as the reason why we shouldn't give the applications."); see also Williams Greenidge Dep. 36 (told that use of the waiting list was because of lack of funds); Keller Dep. 27; Cintron Dep. 37-38; Norberg Dep. 45.)

Brenda Bryant, a Florida RD State Office official who came to St. Croix after Florida assumed management of the Virgin Islands RD offices and programs, directed the St. Croix local RD office to stop use of the application waiting list.  (Bryant Dep. 26.)  Bryant explained that she

abolished the list because she "thought there was a more expeditious manner in providing people information, helping those who were interested in getting a home," not because of any other concerns.  (Id. 28.)

Unrebutted evidence establishes that the use of an waiting list, whether for group meetings or applications or both, developed for office management purposes from an instruction from the Vermont office, and that inertia and overwhelming demand kept the practice in place until the Florida State Office became involved.

Further, it is unrebutted that prolonged extreme emergency conditions created by Hurricane Hugo in September 1989 were disruptive of the administrative abilities of most business entities and Government agencies in St. Croix.  This hurricane devastated the island. There was no electric service for six months after the storm.  A local official testified that approximately 90% of homes for which RD held the mortgage were damaged.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 16, Borck Dep. 38, November 13, 2006.)  The drastic effects of Hugo changed the demands on the local RD office and changed the jobs of some RD staff, including those who had previously focused on investigation of new construction.  (Id. 38.)  Several local officials linked the development or continued use of the application waiting list to the lasting effects of Hurricane Hugo.  (See, e.g., Williams Greenidge Dep. 35-36, 54; Rosa Dep. 59-60.) Those effects are not capable of rebuttal.  They created conditions peculiar to St. Croix because of its location and disabled resources on neighboring islands.[42]  The local RD office was reasonably under emergency constraints.  (See, e.g., Higgins Dep. 42; Williams Greenidge Dep.

---

[42] There is also testimony that Hurricane Marilyn in 1995 had a devastating effect on the island of St. Thomas, and that following that hurricane, there was significant demand for disaster assistance from the St. Thomas RD office.  (Black Dep. 17.)

39-41; Norberg Dep. 66; <u>see also</u> Cintron Dep. 60 (noting that group meetings were suspended for approximately three months after Marilyn because "there were so many other things happening.")

Plaintiffs have submitted no evidence indicating that the reasons advanced by Defendant for development and maintenance of an application waiting list were pretextual for intentional national origin discrimination.

Defendant has presented a legitimate, non-discriminatory reason for the use of an application waiting list in the Virgin Islands local RD offices in lieu of distribution of applications on first request: organization and office management.  Further, Defendant has presented evidence that there existed constraints and circumstances in the Virgin Islands, including high demand, high rates of delinquency on existing RD-held mortgages and exacerbations of daily living for all Virgin Islands residents caused by Hurricanes Hugo and Marilyn.  The described hurricane effects created a unique situation which Vermont and Virgin Islands officials sought to manage.  Defendant has met its burden of production that the challenged practice was implemented and maintained for non-discriminatory reasons, despite Plaintiffs' assertion, without rebuttal evidence, that these reasons must be pretextual.  The ultimate question before the court is whether Plaintiffs, assuming they met their <u>prima</u> <u>facie</u> burden, have advanced any evidence to rebut reasonably the reasons advanced by Defendant for its decision to use a waiting list.  Again, the issue is not whether Plaintiffs can prove that Defendant's actions failed to comply with all applicable regulations but whether Plaintiffs can prove that national origin discrimination was Defendant's regular practice, and that the challenged practice was motivated by intent to discriminate on the basis of national origin.

ii.     Defendant's evidence regarding the funding of Virgin Islands RD programs.

Defendant argues that the funding of the Section 502 and other RD loan programs rebuts any inference of national origin discrimination.  Plaintiffs dispute this contention, and argue that the application waiting list "affected the amount of pooled funds and reserve funds that could be allocated to the Virgin Islands; and that additional funds could have been obtained through administrative or emergency allocations."  (Pls.' Opp. Def.'s Mot. Summ. J. 18.)  The court has reviewed all the record evidence and concludes that Plaintiffs have not produced any competent evidence supporting this argument.  On the other hand, the record concerning the funding of the Virgin Islands RD programs does rebut any inference of national origin discrimination.

A.     RD Funding

Section 502 direct loan funds are made available to the USDA by an annual appropriations bill or a similar mechanism passed by Congress.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 42, David Villano Report ¶ 12.)  The USDA holds a certain percentage of these funds in reserve "to assure certain policy goals and program needs are met."  (Id. ¶ 12.)  The remainder of the funds are distributed directly to the states, including the Virgin Islands, pursuant to an allocation[43] formula for each locality.[44]  (Id. ¶ 12.)  A state's portion of the allocated funds

_____

[43] It is important to distinguish between initial allocated funds and funds that are ultimately obligated by each state.  Initial allocated funds are those set aside for each state at the beginning of a fiscal year.  Ultimate obligations are the funds that each state commits by loan or other distribution by the end of each fiscal year.  An ultimate obligation may be different from an initial allocation.

[44] In his report, Villano notes that the Virgin Islands allocation was not determined by the allocation formula until 1994.  Prior to that year, the Virgin Islands received an administrative

is based on a non-discretionary formula that takes into consideration the state's number of

substandard housing units, rural population, rural population in places with less than 2,500

people, rural population in households with 50-80% of median area income, and rural population

in households with less than 50% of median area income.  (Id. ¶ 8.)  Once funds have been

allocated to one particular state, they cannot be allocated to another state.  (Id. ¶ 13.)  There is,

however, an exception to this rule.  Two "poolings" of funds are conducted by the national RD

office near the end of the fiscal year in order to maximize fund distribution.  Section 502

────────────

allocation.  (Villano Report ¶ 14 n.2, citing 7 C.F.R. 1940.522(f).)  Villano offered an opinion as
to why an administrative allocation was used:

> In the case of the Virgin Islands, I can only conclude that an
> administrative allocation was needed because the use of the
> allocation formula using the 1980 census data yielded too few
> funds to maintain a section 502 program.  Based on the 1980
> Census, the VI share of the formula allocation would have been
> 0.17879%.  This would have resulted in an initial allocation of $1.9
> million.  Accordingly, the Administrator independently set the
> amount for the Virgin Islands.  During the period covered by this
> suit, the only other "state" to receive an administrative allocation
> was the Western Pacific Territories.  In the case of these territories,
> there was no census data available to make an allocation.
>
> The Virgin Islands received administrative allocations of $3.178
> million in 1991 and 1992, and $5.178 million in 1993.  In 1994 the
> Agency began to use the 1990 Census data, and administrative
> allocations were no longer needed for the Virgin Islands as the
> formula allocation was deemed sufficient to maintain a viable
> program.

(Id. ¶ 14 n.2.)  The Villano Report contains a chart of initial allocations and actual funds used
and distributed by the Virgin Islands for each year from 1989 until 2001.  The court notes that in
the years 1989 until 1994, the initial allocation was significantly larger than in the years 1995-
2001.  Plaintiffs have presented no evidence that the number of applications distributed or
received by RD had any impact whatsoever on the administrative allocation made to the Virgin
Islands.

appropriations must be used in the fiscal year for which they were allocated, or they are lost.

(Id.)  The first pooling takes place on August 15th, during which the national office collects

unused funds from each state and reallocates these funds back to the states using the formula.

(Id.)  The second pooling takes place on September 15th, when the national office collects the

remaining unused funds from each office.  (Id. ¶ 14.)  The national office then distributes these

funds only to states that have applications ready to be funded.  (Id.)

### B.    Dr. Carrington's report and Plaintiffs' critique

Defendant proffers the report of proposed expert, Dr. William Carrington, in support of

their argument that funding of RD programs in the Virgin Islands rebuts any inference of national

origin discrimination.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 41, Expert Report of Dr. William

Carrington ("Carrington Report"), December 22, 2006.)  In his report, Carrington draws several

conclusions about the funding of RD programs in the Virgin Islands:

(1)     RD initial allocations are determined by Congressional appropriations based on a
        non-discretionary formula;

(2)     In 11 of 15 years studied, the Virgin Island's ultimate obligations exceeded its
        initial allocations;

(3)     The years in which the Virgin Islands' funding shares were disproportionately low
        were affected by major hurricanes; and

(4)     Due to underfunding, there are more eligible households throughout the United
        States than can be served by the RD direct loan program, but that underfunding is
        less severe in the Virgin Islands than in other states.

(Carrington Report ¶ 13.)

In an attempt to rebut the conclusions posited by Dr. Carrington, Plaintiffs submit a report from proposed expert Dr. Brian Sullivan.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 43, Dr. Brian Sullivan Expert Report ("Sullivan Report"), Feb. 23, 2007; Pls.' Index Supp. Pls.' Opp. Def.'s Mot. Summ. J. Ex. 2.)  In his report, Sullivan criticizes Carrington's failure to include data from the years 1981 through 1988 in his analysis, his reliance on hypothetical qualified households, and his failure to address the waiting list.  (Sullivan Report 2.)  However, the Sullivan Report contains no independent analysis of the funding of RD programs in the Virgin Islands, or elsewhere in the United States.

First, the court will consider Carrington's conclusion that the initial allocation of monies to Virgin Islands RD programs is, for the most part, completely non-discretionary.  There is absolutely no evidence that the number of applications distributed or pending has any impact on the initial RD allocation for any state (including the Virgin Islands).  It is undisputed that the initial allocation of monies to the Virgin Islands RD programs is non-discretionary.[45]  Standing

---

[45] The initial allocation of monies to the Virgin Islands RD programs supports no inference of national origin discrimination.  In Chiang II, The Third Circuit similarly addressed Plaintiffs' argument that the allocation of RD funds to the Virgin Islands was discriminatory, and nothing has changed:

> Chiang also contends that because class members were placed on the alleged wait list, they were never entered into the official USDA database which tracks the number of loan applications in each jurisdiction.  She further submits that due to that lack of data entry, the level of need for funding was never properly assessed and so was never allocated to the Virgin Islands.  The lack of funding, she maintains, was then used as a reason for putting class members on the waiting list, thereby keeping them out of the database and creating a vicious circle.

alone, however, this fact is not sufficient to rebut any inference of national origin discrimination.

Second, the court will consider Carrington's conclusion that in 11 of 15 years studied, the Virgin Island's ultimate obligations exceeded its initial allocations.  The court evaluates this conclusion only with respect to the years in question during this litigation: 1981 until 2000.  No data[46] is available for years prior to 1989, so Carrington begins his analysis with that year.  (Carrington Report ¶ 25.)  The court will examine the data for allocations versus obligations for the years 1981 until 2000.  Initial allocation exceeded ultimate obligations in 1989, 1990, 1991 and 1996 – 4 of 12 years at issue.  (Id. ¶ 28, Fig. 3.)  Ultimate obligations exceeded initial allocations in 1992, 1993, 1994, 1995, 1997, 1998, 1999, and 2000.  (Id.)  Therefore, it is

> There is, however, no basis in the record to support the contention that the amount of funding is tied to the number of persons who seek loans.  The methodology for allocation of housing funds can be found in 7 C.F.R. §§ 1940.552 and 1940.565.  The formula is based on (1) the State's percentage of the National number of rural occupied substandard units; (2) the State's percentage of the National rural population; (3) the State's percentage of the National rural population in places of less than 2,500 population; (4) the State's percentage of the National number of rural households between 50 and 80 percent of the area median income; and (5) the State's percentage of the National number of rural households below 50 percent of the area median income.  On this record, it appears that none of these factors are derived from the USDA's application database.
>
> To the extent that Chiang alleges an unfair allocation of funds to the Virgin Islands, as opposed to discriminatory behavior on the part of the USDA in administering those funds, she seeks relief in the wrong forum and would be better served directing her complaint elsewhere.

Chiang II, 385 F.3d at 263 n.3.

[46] The USDA provided Dr. Carrington with data on each state's obligations (1989 through 2005) and initial allocations (1989 through 2003).  (Carrington Report ¶ 25 n.6.)

undisputed that in 8 out of 12 years at issue, for which data is available, the Virgin Islands obligated more money than its initial allocation amount.  This was likely achieved through a combination of "pooled" funds and reserve funds that were made available.

Third, the court will consider Carrington's conclusion that each of the years in which the Virgin Islands' initial allocation exceeded its ultimate obligations was affected by a major hurricane.  Hurricane Hugo occurred in September 1989 and Hurricane Marilyn occurred in September 1995.  Carrington states that due to the hurricanes, "conventional" section 502 loans were "crowded out" by section 504 repair loans and other Federal disaster-relief programs in the years during and immediately following the hurricanes.  (Carrington Report ¶ 29.)  Thus, Carrington partially attributes the shortage of section 502 obligations in those years to the increase in other federal mortgage funds available in the Virgin Islands.  However, he has presented no data establishing such increases in other federal mortgage funds.  There is record evidence of increased demand for emergency loans and disaster relief after the hurricanes, which may have impacted RD's abilities to focus on new Section 502 loan-making, due to limited staff resources.  (Black Dep. 17.) Plaintiffs point out that fiscal year 1989 ended on September 30, 1989, that Hugo occurred only a couple of weeks before the end of the fiscal year, and that Hugo hit after August 15, 1989, the date of the first "pooling" when jurisdictions send back their unobligated allocation for redistribution.  The record evidence shows that the hurricanes impacted the ability of the St. Croix office in conducting its usual business.  For example, RD officials did not hold group informational meetings for at least the six months after Hugo when St. Croix had no electric service (See, e.g., Norberg Dep. 66, 76-81, 96-99; Cintron Dep. 35-36, 59-61; Ramos Dep. 28-32, 45.), and there were no group meetings on St. Thomas for several

months after Hurricane Marilyn.  (Cintron Dep. 60.)

The reason for the shortage of section 502 obligations in 4 of the 12 years studied is disputed, in part, and unknown, in part.  Plaintiffs have proposed no explanation for the shortage, and there is no evidence in the record from which the court can draw any inference of national origin discrimination, particularly in light of the undisputed evidence that in the majority of years at issue,[47] the Virgin Islands RD program obligated more funds than it was initially allocated.

Fourth, the court examines Dr. Carrington's conclusion that due to underfunding, there are more eligible households in the United States than can be served by the RD direct loan program, but that underfunding is less severe in the Virgin Islands than in other states.  Carrington calculated a ratio of ultimate obligations to initial allocations and used this ratio to compare average loan-making activity in the Virgin Islands and in the United States, as a whole.  (Carrington Report ¶ 30.)  He concluded that in all but four years analyzed, the Virgin Islands' obligations/allocations ratio was higher than the national average.  (Carrington Report ¶ 30-31.)  Defendant argues that this analysis demonstrates that the RD funding process actually <u>favored</u> the Virgin Islands in the distribution of direct loan funding.  Finally, Carrington concluded that RD made more loans per qualified household[48] in the Virgin Islands than in the United States as a whole.  (<u>Id.</u> ¶¶ 37-38.)

For Plaintiffs, Dr. Sullivan opines that Dr. Carrington's calculations based on "qualified households" are not reliable.  (Sullivan Report 2-3.)  In addition, Dr. Sullivan argues that Dr.

---

[47] Years for which funding data is available (1989-2000).  (Carrington Report ¶ 25.)

[48] "Qualified household" is a term created by Dr. Carrington for the purpose of this analysis and is not a term used by RD or the USDA, nor is it based on a formula used by Defendant in determining loan eligibility.

Carrington's report as a whole suffers from his failure to consider the impact of the waiting list. (Sullivan Report 2-3.)

Dr. Sullivan's report and conclusions suffer from a large, basic pitfall. Logically, the existence of the waiting list could have had no impact whatever on the statutory formula for the initial allocation of funds. Further, Plaintiffs' arguments that the existence of the waiting list "pushed" individuals into later years when there was less funding or more stringent eligibility requirements is speculative and not subject to class-wide proof.[49] Plaintiffs cite the expert reports of former Secretary of Agriculture Mike Espy[50] and former Office of Management and Budget (OMB) official Joseph Hezir in support of their arguments that the waiting list hid the extent of the need in the Virgin Islands. (Pls.' Opp. Def.'s Mot. Summ. J. 24.) Specifically, Plaintiffs argue that "Had the Secretary of Agriculture been informed of the failure to give out applications and the true level of need in the Virgin Islands, he could and would have ended the practice and obtained additional monies for the Virgin Islands in order to 'substantially' alleviate the problem, which in fact was a serious civil rights problem." (Id.) Plaintiffs explain that Espy was "designated as an expert to opine on the political aspects of being a Secretary of Agriculture and all the tools – political technical and otherwise – that permeate a Secretary of Agriculture's daily transactions and decisions on behalf of the USDA." (Pls.' Mem. Opp. Def.'s Mot. Limine

---

[49] This contention does not support any inference of national origin discrimination, nor does it undercut Defendant's efforts at establishing a legitimate non-discriminatory reason. If Plaintiffs offered individual proof of eligibility, it would be relevant for damages purposes, only.

[50] Plaintiffs have submitted a statement from Espy, that they would hope to offer as an expert report. (Pls. Mot. Summ. J. Ex. 73, Expert Report of Mike Espy, October 13, 2006.) Defendant filed a Motion in Limine (Docket No. 2479) seeking the exclusion of the statement and testimony of Espy.

Exclude Espy 4.)  As the court ruled during the record hearing held on May 25, 2007, Espy's

opinions concerning what he would have done to divert more funds within the USDA to Section

502 programs in the Virgin Islands and what steps he would have taken to remedy the situation,

had he become aware of the use of a waiting list, amount to no more than speculation and are,

therefore, not helpful to the court's review of the pending dispositive motions.  (Oral Arg. Tr. 6-

7, May 25, 2007.)  Moreover, Espy has cited to no statutory authority that would have permitted

the Secretary of Agriculture to bypass the allocation formula created by statutory law.  For these

reasons, the court must grant Defendant's Motion in Limine.[51]  No separate order will be issued.

Plaintiffs also offer the report of proposed expert Hezir to support their arguments that

additional funds could have been obtained for the Virgin Islands RD Program.  (Pls.' Opp. Def.'s

---

[51] Espy offers seven opinions in his report: (1) that the application waiting list violated the law; (2) that the waiting list treated Virgin Islanders differently than mainland "majority" borrowers; (3) that the application waiting list concealed from decision makers in Washington the high level of need for the Section 502 program in the Virgin Islands; (4) what he could have done to divert more funds within USDA to the Section 502 program in the Virgin Islands; (5) that had he become aware of the waiting list, what other steps he would have taken to remedy the situation; (6) that the administration of the construction defect program violated the law; and (7) that the construction defect program treated Virgin Islands differently than mainland "majority" borrowers.  It is clear that opinions (1), (2), (3), (6) and (7) go to ultimate legal issues and are an inappropriate subject for expert testimony.  Opinions (4) and (5), as the court ruled, are speculative and therefore incompetent to serve as evidence before this court.  For example, in his deposition Espy testified there existed other states in the United States, including Mississippi, Texas, Tennessee and Michigan that have historically had large numbers of unfunded applications.  (Pls.' Index Supp. Pls.' Opp. Def.'s Mot. Summ. J. Ex. 6, Espy Dep. 95, Jan. 12, 2007.)  Espy testified that he would have found funds to send to the Virgin Islands, but not these other states in which demand exceeded loan monies available, because a "[s]queaky wheel gets the grease in a system of politics, particularly if it's deemed to be of a discriminatory nature. Particularly if it's deemed to be a violation of regulations."  (Id. 107.)
This is not an adequate basis for Espy's opinion that he would have secured from Congress more Section 502 loan funds for the Virgin Islands, especially where there were rural areas in states more needy than the Virgin Islands.  In addition, it must be noted that Espy was the Secretary of the USDA for only two years.  The time period at issue in this litigation is 19 years.

Mot. Summ. J. Ex. 4, Expert Report of Joseph S. Hezir ("Hezir Report"), Feb. 23, 2007.)  Hezir

opines:

> Based on my experience, it would be my opinion that the Secretary
> of Agriculture could obtain OMB approval of a reapportionment
> request to implement the interchange transfer authority to augment
> funding to correct the problems in the Virgin Islands caused by the
> large backlog of unfunded applications and the identification of a
> waiting list of applicants.

(Hezir Report 13.)  This opinion does not address whether there were funding disparities of RD

programs in the Virgin Islands, but only advances speculation as to how the political process

might have been utilized to correct "problems" in the Virgin Islands.  This does not impact this

court's analysis of whether the parties have met their respective burdens: whether Plaintiffs have

established an inference of national origin discrimination, and, if so, whether Defendant has

rebutted that inference.  The possibility of being able to obtain additional RD funds through the

political process neither supports Plaintiffs' prima facie case nor their arguments that

Defendant's evidence is not sufficient to rebut any inference of national origin discrimination.

Finally, even assuming that in some years, had the Virgin Islands RD offices had more

completed, but unfunded, applications on hand and would have received even more "pooled"

funds, that still would not raise any inference of national discrimination.[52]  Nationally, the

demand for Section 502 loan monies far exceeded the monies allocated to the programs.  There is

no evidence that the Virgin Islands was more "needy" than other states.  There is evidence that

---

[52] The same is true with respect to the possibility of obtaining reserve funds.  Plaintiffs
submit the testimony of Virgin Islands RD official Nichols, who testified that had there been
more unfunded but processed applications at hand, "I would have certainly had a little more
leverage in trying to obtain reserve monies.  We obtained reserved monies on more than one
occasion."  (Nichols Dep. 44.)  No inference of intentional national origin discrimination arises
from a possible missed opportunity to request special reserve funds.

the contrary was true.

Plaintiffs' argument that the USDA should have allocated more money is legally

frivolous.  A court could not have compelled Congress to appropriate and allocate more money

to the Virgin Islands.  Even if Congress had allocated more money to RD programs nationally, it

would have had to have been distributed according to the statutory proportional distribution

formula.  In years in which there were pooled funds, the Virgin Islands received its pro rata share,

and those monies were utilized by Virgin Islanders.  Plaintiffs have not presented evidence of

historical funding disparities.

The undisputed evidence shows unequivocally that the Virgin Islands was treated

equitably and without discrimination in the allocation of RD monies.  Although there are

disputed issues of fact concerning some details of funding, including why ultimate obligations

were lower than initial allocations in 4 of the 11 relevant years, the court concludes that those

disputes are not material to the issue of national origin discrimination.  Defendant has presented

sufficient unrebutted evidence that there existed no discriminatory intent in the allocation of RD

funds to the Virgin Islands.[53]

Having scoured the record, the court concludes that Defendant has presented a legitimate

non-discriminatory reason for use of the application waiting list, specifically, that the waiting list

practice was implemented as an organizational tool to manage a high demand jurisdiction.  In so

concluding, the court does not determine whether the failure to hand out applications on demand

---

[53] In fact, there is deposition testimony about the continuous efforts to obtain additional
funding for Virgin Islands' RD programs.  (See, e.g., Higgins Dep. 26-27 (describing efforts to
use the allocation provided by the national office, to obtain additional funds from the year-end
pooling, and to obtain additional funds.  Higgins stated that under the supervision of
Vermont/New Hampshire, the Virgin Islands had a "very stimulated loan making program.").)

violated any internal USDA or RD guidelines or any federal regulations in effect at the time.  The court only concludes that Defendant has presented sufficient evidence to rebut any inference of national origin discrimination.

> e.   Plaintiffs present no additional evidence from which any fact-finder could conclude that Defendant's offered reason is pretext for national origin discrimination.

Even if the court were to conclude that Plaintiffs have established an inference of national origin discrimination for the purpose of establishing a prima facie case of pattern and practice discrimination, the court would still be compelled to find on this record that Plaintiffs have not submitted sufficient evidence such that a reasonable fact-finder could conclude that Defendant's proffered reasons for the use of the waiting list were a pretext for national origin discrimination.

A plaintiff may "cast sufficient doubt on a defendant's legitimate nondiscriminatory reason by showing 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the [defendant's] proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence.'" Maull v. Division of State Police, 141 F. Supp. 2d 463, 482-83 (D. Del. 2001) (citing Reeves, 120 S.Ct at 2106 (citations omitted)), aff'd 39 Fed. Appx. 769 (3d Cir. 2002).

Plaintiffs argue, without more, that Defendant's nondiscriminatory reasons were pretextual.  They rely solely upon the use of the waiting list and the argument that failure to distribute loan applications on demand violated internal guidelines and federal regulations. Plaintiffs contend that in no other jurisdiction in the United States, including those identified by several RD officials in this matter as being high demand jurisdictions was an application waiting list used or were applications not distributed on demand.  That contention does not correctly

reflect the record.  Defendant has presented evidence that the practice of holding group meetings and for the use of a list to track interest in RD programs was intended by Vermont officials to mimic successful management tools implemented in several high-demand jurisdictions in Vermont and New Hampshire.  (See, e.g., Higgins Dep. 38-41.)  In addition, there is evidence that the Virgin Islands were under unique strains caused by two major hurricanes that further stressed a system that was already stretched thin, and that the duration of the use of the waiting list and the failure to hand out applications routinely on demand, unlike the other jurisdictions under Vermont's supervision, was a combination of administrative directive and an ad hoc local official response to emergency conditions.

Defendant's Motion for Summary Judgment must be granted because Plaintiffs cannot establish that there is any disputed issue of material fact that Defendant perpetrated a practice of intentional national origin discrimination in its use of a waiting list and/or the failure to hand out loan applications upon request.  Having so found, the court concludes that Plaintiffs cannot meet their burden under review standards applicable to their Motion for Summary Judgment. Plaintiffs' Motion for Summary Judgment is therefore denied.

**D.      ECOA Count II: Acts Occurring Between Issuance of Loan Application and Prior to the Funding of Loan**

Defendant also seeks summary judgment on Counts II and III, which will be addressed in turn.  In the headings of these counts, Plaintiffs indicate that they are being brought by several individually named plaintiffs against Defendant.  The language within each count itself, however, shows that these counts are being brought on behalf of a class of individuals.  (See, e.g., First

Amend. Compl. ¶¶ 58, 140.)  The court recognizes that the class reformed by the Third Circuit was certified for the issue of the "waiting list and associated techniques" which broadly includes the causes of action pled in Counts II and III.  See Chiang II, 385 F.3d at 266.  Both parties treat Counts II and III as class counts, and the court finds that they are class counts, and will adjudicate them as such.

       1.      The allegations of Count II.

In Count II, Plaintiffs' allegations focus on acts occurring between the distribution of a loan application and the funding of a loan, and aver that these alleged violations flowed from the initial placement of individuals' names on the application waiting list.  (First Amend Compl. ¶ 53.)  Plaintiffs allege that

> Commencing on or about early 1997, and continuing without interruption thereafter, Defendant instituted unlawful patterns and practices to deny representations[sic] who sought services through Defendant's Rural Development offices in the U.S. Virgin Islands by taking the applicants' Loan Applications from its unlawful 'waiting list,' falsely advising Plaintiffs that their Loan Applications were being fairly and lawfully processed by Rural Development when Defendant, then and there, knew full well that either (1) the applications were not processed for the applicants of the U.S. Virgin Islands or (2) if the applications were processed, they were rejected without adequate consideration.  This pattern was and continues to this date to be known in Rural Development offices in the U.S. Virgin Islands as the 'Impossible Yes.'

(Id. ¶ 54.)

In Count II, Plaintiffs list specific actions Defendant allegedly undertook against individual plaintiffs, which Plaintiffs further allege are typical of actions taken against Virgin

Islanders who sought housing services and credit assistance through RD programs.[54]  (Id. ¶¶ 58-138.)  Despite Plaintiffs having identified 1997 as the year in which the "impossible yes" began, each of the specific actions that Plaintiffs allege took place prior to 1997.  Generally, these individual allegations fit into the following categories, and the court has identified problems with several of these claims:

Claim 1.     That after having submitted a loan application and found by RD to be eligible, an individual received a letter from RD stating that no financing was possible at that time, due to a reduction in the amount of funds appropriated to Defendant.  (See, e.g., First Amend. Compl. ¶ 60.)

Defect:     Plaintiffs do not allege that reduction in funds did not actually exist.

Claim 2.     That after individuals resubmitted loan applications, they were told that their income exceeded the income limit set for eligibility for a loan, and that the national RD office had lowered the income ceiling.  (See, e.g., id. ¶ 66.)

Defect:     Plaintiffs do not allege that these changes to eligibility requirements did not exist nationally.

Claim 3.     That Defendant incorrectly calculated applicant income or otherwise incorrectly determined that an applicant was not eligible for the loan programs.  (See, e.g., id. ¶¶ 24, 81.)

---

[54] Plaintiffs incorporate the allegations of Count I regarding the application waiting list, and allege that, had they received loan applications upon their first requests, they would have received loans at that time.  (First Amend. Compl. ¶¶ 52, 138.)

Claim 4.       That eligibility determinations were impacted by individual's complaints

               of discrimination.  (See, e.g., id. ¶¶ 92-93.

               Defect:        The nature of the individual's claim of discrimination is not

                              specified.

Claim 5.       That after rejecting loan applications, Defendant failed to advise the

               applicants of their right to appeal the denial of their loan applications or

               provide assistance in other efforts to obtaining financing through other

               programs administered by Defendant.  (See, e.g., id. ¶¶ 106-107.); and

Claim 6.       That Defendant failed to inform individuals seeking construction loans of

               the specific requirements for a building site until after they had acquired

               land.  The land was then deemed unsuitable, and the construction loans

               were denied as a result.  (See, e.g., id. ¶¶ 114-17.)

               Defect:        Plaintiffs do not allege that these requirements were not

                              actually RD requirements, but rather that Defendant failed

                              to inform applicants of these requirements prior to the

                              purchase of land.  (See, e.g., id. ¶¶ 116-17.)

Plaintiffs also argue that had they not been subjected to the "impossible yes" scheme, they would

have received loan proceeds.  (Id. ¶ 138.)

        2.      Timeliness

                a.      Section 741 does not apply to extend the statute of limitations in Count II.

        The court incorporates by reference as if restated in its entirety its discussion concerning

Section 741 and its holding that no complaints submitted to Defendant qualified as an "eligible complaint." For those reasons, Section 741 does not extend the statute of limitations for any actions alleged by Defendant as constituting the pattern and practice of national origin discrimination as to Count II.

        b.    <u>Plaintiffs have failed to produce evidence that any acts of alleged discrimination that are cognizable under ECOA occurred within the application statute of limitations period.</u>

Plaintiffs contend that they have offered substantial evidence that discriminatory acts took place between January 11, 1998 and January 11, 2000 and cite[55] to their Answers to Defendant's First Set of Interrogatories and Request for Production, Answer to Interrogatory number 1, "and a bit of supportive deposition testimony." The court has reviewed the interrogatory answer, and finds the list of allegedly discriminatory acts occurring during the limitations period is limited to the following:[56]

- In 1998, Emeryl Christopher, Al Brunn, Theresa Collingwood Morris, Rhea Johnson, Kimberly Oliver, Keith Williams, and Precious Yearwood filed or attempted to individually file administrative complaints of discrimination, which were never resolved. (Pls.' Mot. Summ. J. Ex. 63, Pls.' Answers Def.'s First Set Interrogs, Interrog. No. 1 57-58.)

---

[55] This generalized citation form, used on multiple occasions, is not only insufficient and improper, but capable of being misleading. All parties are expected to support their arguments with specific record citations to an exhibit number and a page number, when applicable. It is not the duty of the court to comb through the record looking for support for the parties' arguments, particularly in this instance, when the record is well over a thousand pages in length.

[56] The court does not include any actions pertaining to the waiting list or the distribution of a loan application in this list, as those actions relate to Count I, and have been fully discussed in the discussion thereof.

- In 1999, G. Rivera's administrative complaint was denied without consideration. (Id. 59.)

- On January 6, 2000, D. Pittman's administrative complaint of discrimination was denied. (Id. 61.)

- In 1999, Eunice Gomes' loan was "approved on the condition that she use a specific contractor." (Id. 59; see also id. 115.)

- In 1999, Rawlins continued to seek construction defect assistance from Defendant, but Defendant refused. (Id. 59, 155.)

- "Throughout 1998 to 2004, Mr. Freeman continued to return to defendant's St. Croix office to attempt to 'work out' the wrongful denial [of his loan application] in good faith, but was summarily rebuffed each time." (Id. 108.)

With respect to the statements that Defendant failed to investigate the discrimination complaints of several class members during the limitations period, the court finds that such actions are not cognizable under ECOA. The D.C. Circuit addressed this question in two cases, Garcia v. Johanns, 444 F.3d 625, 637 (D.C. Cir. 2006), and Love v. Johanns, 439 F.3d 723, 732, and concluded in both that the failure to investigate a discrimination complaint is not a "credit transaction" under ECOA. Plaintiffs have not presented any legal authority to the contrary. This court agrees with the reasoning of the D.C. Circuit and adopts it here. The court further holds that the denial of an administrative complaint is not a "credit transaction" within the meaning of ECOA. The failure to investigate discrimination complaints and the denial of such complaints are not cognizable under ECOA, and any evidence that such failures occurred during the

limitations period is irrelevant to a determination of whether the ECOA counts are timely.

Similarly, the alleged failure of the Defendant to resolve Rawlins' complaints concerning constructions defects, to assist her with the complaint resolution process of the independent home warranty company or manufacturer, or to provide her with compensation to correct any construction defect are not credit transactions under ECOA. As held above, the failure to investigate or resolve complaints is not a credit transaction. Further, the failure to provide a construction defect <u>grant</u> to compensate for construction defects is not a credit transaction. This is highlighted by 7 C.F.R. § 1924.265, which outlines what factors are included in a determination of "Eligibility for compensation for construction defects", and which, critically, does not mention an applicant's credit. The failure to remedy construction defects, to provide a grant to remedy construction defects, or to investigate and assist, with construction complaints are not cognizable as a credit transaction under ECOA, and the court is not permitted to consider whether these instances occurred during the limitations period.

The interrogatory answers also state that "Throughout 1998 to 2004, Mr. Freeman continued to return to defendant's St. Croix office to attempt to 'work out' the wrongful denial in good faith, but was summarily rebuffed each time." (Pls.' Answers Def.'s First Set Interrogs. 108.) Despite Plaintiffs' argument otherwise, the interrogatory answer is clear that the loan was denied in 1997.[57] (See id. 106-10.) Freeman's subsequent attempts to "work out" the allegedly

---

[57] The court will assume that Plaintiffs' counsel's argument that Freeman and Rivera's loan was denied in 1999 and not 1997 was an unintentional error and not an attempt to deliberately mislead the court. Nevertheless the error is one of manifest proportions in terms of the use of the court's time and resources, given the volume of materials reviewed.

Also contained in Freeman and Marilyn Rivera's interrogatory answer is a statement that in 1999 the USDA foreclosed on the property of Antonia Leonadia, the landlord of Freeman and

wrongful denial are not credit transactions.  There is no statement that he again attempted to apply for a loan during the limitations period.

Finally, the court addresses the evidence concerning Gomes' loan.  In her answer to the interrogatory, it is stated that:

> In 1999, defendant finally gave Ms. Gomes another loan application, which Ms. Gomes filled out and turned in on August 18, 1999.  This time she was found eligible and defendant had no objections to the very same property it had several times previously rejected as ineligible.  Her loan was approved, on the condition that she use a specific contractor supplied to her by Rural Development.

(Id. 59.)  The court will look to Gomes' deposition testimony to explain her conclusion that her "loan was approved, on the condition that she use a specific contractor supplied to her by Rural Development."  Gomes testified that local RD official Valerie Greenidge "told" her to hire a particular contractor.  (Gomes Dep. 50.)  Gomes testified that Greenidge presented her with a list of contractors "that Rural Development deals with" and Greenidge pointed to one name

--------

Rivera, a property that they <u>hoped</u> to purchase with a USDA loan that they had <u>hoped</u> to secure. (Pls.' Answers Def.'s First Set of Interrogs. 108.)  It is also stated that Leonadia was in default of her USDA-held mortgage.  Thus, this paragraph is irrelevant to the pattern and practices at issue in this case, and specifically, is irrelevant to Plaintiffs' argument that Defendant took discriminatory actions against Freeman and Rivera during the limitations period.  The court also notes that the portion of Plaintiff's Answer to Defendant's Interrogatory concerning 1999 contains no mention of Freeman or Rivera.

Also, in their Opposition to Defendant's Motion for Summary Judgment, in support of their argument that they have produced evidence of discriminatory acts occurring within the limitations period, Plaintiffs cite to Freeman and Rivera's interrogatory answer to establish that "[i]n 2000, the USDA amended its complaint in foreclosure against a Ms. Leocadia to seek to extinguish Frederick Freeman's and Ms. Rivera's $5,100 lien on the property . . ."  (Pls.' Opp. Def.'s Mot. Summ. J. 29.)  The interrogatory answer, however, clearly states that "**On or about April 25, 2000**, the USDA amended its complaint in foreclosure . . ."  (Pls.' Answers Def.'s First Set Interrogs. 108.)  The month of the foreclosure, which clearly falls <u>outside</u> of the applicable limitations period, was omitted by Plaintiffs.  This is a serious misquote of Plaintiffs' own Interrogatory Answer.

specifically and said "you can hire this one." (Gomes Dep. 51.)  Critically important is the fact

that Gomes did not testify that she was told that she was <u>required</u> to hire a specific contractor in

order to obtain her loan.  Her deposition testimony does not support a conclusion that her loan

was "conditioned" on her hiring of a particular contractor.  So, her supposition is disregarded.

Further, Defendant's evidence is unrebutted that RD is permitted to distribute a list of contractors

to applicants for informational purposes and that these lists include a disclaimer that clearly reads

that an applicant is not required to use those particular contractors.  (<u>See</u> Def.'s Reply Mem.

Supp. Mot. Summ. J. Ex. 97, RHS Handbook § 5.25; Def.'s Reply Mem. Supp. Mot. Summ. J.

Ex. 95, Contractor List, August, 1994.)  Further, Defendant's regulations require loan applicants

to use contractors who meet specific requirements.  7 C.F.R. § 1924.6.  Therefore, the court finds

that evidence does not raise a genuine issue of material fact that Defendant conditioned Gomes'

loan on her selection of a specific contractor.  Evidence that a contractor list was provided to

Gomes or that a specific contractor was suggested to her for use is not evidence that a pattern or

practice of discrimination, through the "impossible yes," existed during the limitations period.

The court concludes that Plaintiffs have not identified any specific evidence that any

allegedly discriminatory actions, cognizable under ECOA, occurred during the limitations period.

Therefore, the continuing violations doctrine cannot apply.  As a result, Plaintiffs' ECOA Counts

II and III are untimely.  The court grants Defendant's Motion for Summary Judgment for this

reason.

### 3.      The merits of Count II.

Assuming, arguendo, that a reasonable fact-finder could conclude that Plaintiffs have established a genuine issue of material fact as to whether any alleged acts of discrimination occurred during the limitations period, the court will proceed to address Defendant's contention that summary judgment must nevertheless be granted on Count II because Plaintiffs have failed to establish a pattern and practice of discrimination in RD's treatment of loan applicants and prospective loan applicants between the time of distribution of a loan application and prior to the funding of the loan.

Because Plaintiffs' allegations are that Defendant sought to frustrate the housing loan applications of Virgin Islanders, Plaintiffs must produce evidence such that a reasonable fact finder could find that there was a pattern and practice of such efforts at frustration and that there was intent to discriminate on the basis of national origin.  Isolated instances of adverse actions are not enough to establish a pattern or practice of discrimination.

Having considered the record, the court concludes that Plaintiffs have not produced evidence to establish an inference of national origin discrimination by Defendant through its administration of its RD loan programs in the Virgin Islands as alleged in Count II.  Plaintiffs have not submitted evidence from which a reasonable fact-finder could conclude that there existed a pattern and practice of intentional discriminatory action perpetuated by Defendant against individuals who had received loan application forms to discourage them from pursuing loan applications.

a.     Several of the claims of alleged discriminatory actions are deficient on their face because they do not suggest that these actions were not legitimate agency actions, but only that they had an adverse effect on individual class members.

Before addressing the evidence Plaintiffs do offer in support of their allegations in Count II, it is observed that the claims falling into categories (1), (2), and (6) above, are allegations that despite being eligible, an individual was not given a loan because funding was reduced, that they were determined not to be eligible because eligibility standards had changed, or that Defendant delayed in notifying individuals seeking construction loans of the requirements for the land. Plaintiffs do not allege that there were no reductions in funding, that the eligibility standards did not change or that these land requirements were not actually RD requirements.[58]

b.     Plaintiffs have not produced specific evidence to raise a genuine issue of material fact that discrimination and the "impossible yes" was Defendant's standard practice by its acts between the distribution of a loan application and prior to funding.

Plaintiffs offer the unofficial Civil Rights Compliance Review Report ("Report"), previously discussed as being unreliable due to investigation deficiencies, the testimony of investigation team member Charles Morris, the testimony of local RD employee Richard Rounds, as well as anecdotal testimony to support the allegations in Count II.  The time frame of 1997 and the years after, as suggested by the Report and Rounds' testimony, however, is at odds with the time frame of 1996 and years prior, as suggested by the individual allegations pled as part of Count II in the First Amended Complaint.  This discrepancy highlights Plaintiffs' failure

---

[58] Such allegations seem related to attempting to establish possible damages in connection with the use of an application waiting list, rather than in establishing a pattern of practice of national discrimination in the "impossible yes."

to prove a connection between the individual acts and the concept of the "impossible yes"

allegedly implemented by the Florida State Office.

i.     <u>The Report and Charles Morris' testimony.</u>

Plaintiffs argue that the unofficial Report completed following the RD fact-finding trip to

St. Croix in July 1997 raises a genuine issue of material fact as to the existence of a pattern and

practice of national origin discrimination perpetrated by Defendant through a scheme known as

the "impossible yes." The Report discusses the "impossible yes":

> Following the elimination of the waiting list, three RD employees
> indicated that they were informed by management of the Florida
> State office to distribute applications to anyone asking but to give
> the "impossible yes." The employees reported to the review team
> that they were informed by the Community Development Manager
> (CDM) in the Florida State office that there were many ways to
> make it difficult for individuals to complete applications for
> assistance. This became known as "the impossible yes." To
> summarize, applications would be given out, but actions would be
> taken to make it difficult for the inquiring party to meet
> qualifications and deadlines. The applicants would become so
> frustrated that they would withdraw their applications. Agency
> representatives in Florida, including the district director and the
> state director denied this strategy was ever suggested or endorsed
> by them. The district director indicated that everything possible
> was being done to provide fair service and timely information to all
> who applied. The state director indicated giving people a message
> of an "impossible yes" would be a serious charge and that he was
> unaware of any such action.

(Report 006446.) Charles Morris, in his notes from the investigation, identifies Rick Rounds and

Valerie Williams[59] as two of the RD employees who brought the "impossible yes" to the

attention of the investigative team. (<u>Id.</u> 006519.) In addition to the statements summarized in

---

[59] Also known as Valerie Williams Greenidge.

the report, Morris notes that Williams told him that "when she called her state office about a public meeting the previous Friday evening, she was told to give out applications and that she 'would know what to do with them.' She interpreted this as to give the people the impossible yes." (<u>Id.</u> 06519.) Finally, it is noted in the Report that customers/clients stated that RD staff treated them in a derogatory and demeaning manner, thereby discouraging them from applying or denying them the opportunity to apply for home ownership. (<u>Id.</u> 006446.)

The Report does not state whether any local RD staff or officials ever took any action to make it difficult for individuals to complete applications for assistance, and the Report does not specify what "actions" were to be taken to effectuate the "impossible yes." Further, the hearsay information upon which the author(s) of the Report appear to rely is vague and provides no nexus, between the concept of the "impossible yes" and the actions alleged by Plaintiffs in Count II.

ii.   <u>Testimony of other local officials</u>

Plaintiffs argue that the deposition testimony of Richard Rounds, who worked in the local St. Croix RD office and who met with Morris during the Civil Rights investigative trip supports the proposition that "the 'impossible yes' was [a] well known and understood technique." (Pls.' Opp. Def.'s Mot. Summ. J. 25.) Plaintiffs have submitted a brief excerpt from Rounds' deposition testimony as an exhibit. (Pls.' Opp. Def.'s Mot. Summ. J. Ex. 45, Rounds Dep., Nov. 13, 2006.) The questions posed by Plaintiffs' counsel relating to the "impossible yes" and Rounds' responses thereto follow:

Q:      Are you familiar with a term called the impossible yes?

A:      Yes, I am.

Q:      All right.  And what's your understanding of the impossible yes?

A:      Well, my understanding was when somebody wanted something from Rural Development that was – the impossible yes is a Florida item.  Somebody from – a contractor or whatever wanted something from rural development that did not fit into their cookie-cutter vision of how everything should be, we would tell them – they would be told yes, but things would be made difficult for them enough so that it would not happen.

Q:      All right.  And what do you mean when you say cookie-cutter way things were done?

A:      Well, it's my opinion that they like to see construction done in a certain way.  It was very simple for them, for Florida, which led them to subdivisions rather than individual houses, subdivisions with all of the same house.  One contractor, conditional commitments, very little effort, everything straight forward, very little risk for anybody.  I mean, there are some good points to this really.  I mean, it was an easy way to do it, easy for them, and just everything was smooth and went right through, and the person got their house, the contractor got paid, and things marched on, there were no problems, you know, no red flags ever showed up from their county, so on and so forth.

Q:      The little contractor, the one house at a time guy, when he would submit a bid or plans or otherwise, when he would want to perform construction of a house for a client, is that the type of person who would be given the impossible yes?

A:      I'd say that's correct.

Q:      All right.  And what did you mean that they would be told yes but required to fill out forms?

A:      I don't think I said that.

[Objection from defense counsel]

Q:      Describe to me how the impossible yes was implemented.

A:      The easiest way I can look at it is the contractor would
        come in and say, you know, I want to build a house for this
        person.  They would say, sure, we're going to do it in two
        payments, you know, when you get to this point, you'll get
        half the money.  When you finish, you'll get half the money
        plus the retainage.  And the guy would say, you know, how
        am I going to build this?  I need money to start.  And they'd
        say, this is how we do it.  So they said, yes, we're happy to
        have you, and here's how you're going to do it, and they
        couldn't afford to do it, so the guy said sorry.

Q:      Did you observe this happen while you were there?

A:      We were – you know, the amount of time it takes for the
        small houses from construction to, you know, there was
        some backlog that we went through, but we were evolving
        into this.  As things moved on, they were evolving into this
        system where it was two payments and so on and so forth.
        And I don't know exactly when that took place, when the . .
        .

[End of deposition transcript excerpt submitted to the court]

(Id. 58-60.)

In this deposition, Rounds claims familiarity with the term "impossible yes" and its

origination with the Florida office, but does not explain the basis of his knowledge.  His sole

example of what constituted the "impossible yes" relates to contractors and construction,

specifically a two-part payment system to contractors, the first payment being made only upon

completion of a specified amount of construction.  There is no evidence that this payment

structure, if it did exist in the Virgin Islands, did not exist in other jurisdictions or was not

required by Defendant's regulations.  Further, there is no evidence that Rounds ever observed the

"impossible yes" in practice or whether he even had knowledge of its implementation: "As things moved on, they were evolving into this system where it was two payments and so on and so forth.  And I don't know exactly when that took place . . ."[60]  (Id. 60.)

The Report, along with the testimony of Richard Rounds, are insufficient to establish the existence of a practice, the "impossible yes," to frustrate unlawfully the access of Virgin Islander prospective applicants to housing loans.  Further, the evidence does not address the actions alleged in the First Amended Complaint to constitute the "impossible yes", including that Defendant incorrectly calculated applicant income or otherwise incorrectly determined that an applicant was not eligible for the loan programs, that eligibility determinations were impacted by an individual's complaints of discrimination, and that Defendant failed to advise the applicants of their right to appeal the denial of their loan application and failed to provide information to these unsuccessful applicants about other housing assistance programs administered by Defendant.  Finally, this evidence attempting to link the development of the "impossible yes" to Florida's assumption of supervision of the Virgin Islands RD offices in 1997 is totally inconsistent with the time line suggested by the individual allegations of Count II, as pled in the First Amended Complaint, which Plaintiffs allege occurred in 1996, at the latest.


iii.    Individual anecdotal information

Plaintiffs further argue that they have produced testimonial and written evidence of a "number of examples of the [impossible yes] technique in action."  (Pls.' Opp. Def.'s Mot. Summ. J. 25.)  These examples are summarized in full:

---

[60] The full answer to this question was not submitted to the court.

(1)     Defendant told Dave Nicholas that he had credit problems, when he did not and maintained this position even after Nicholas provided proof, continuing to find him ineligible for a loan.

(2)     Defendant improperly included the income of Andrea Carroll's boyfriend in its eligibility determination.

(3)     Others, not specified, were told that "their land was unacceptable for reasons that were not true."  (Id. 26.)

(4)     Shirley Williams and Eunice Gomes' land was determined ineligible, for reasons not explained, while a local USDA official was approved for a loan based upon land that was on the same block.

(5)     Shirley Williams' plans were disapproved on the basis that she was a single woman.

(6)     One plaintiff, not specified, was told that she needed to have more children in order to get a loan.

(7)     Frederick Freedom and Marilyn Rivera were told that they needed to get married in order to obtain a loan.

(8)     Ruth Dublin was told that she needed a co-signor in order to get a loan.  When Dublin provided a co-signer, she was told that she still did not qualify for enough money to build a home.

(9)     Beverly Rawlins was told that her land was approved, and then told that it was not approved.  When Rawlins obtained a new parcel of land and new plans, Defendant told her that she was no longer qualified.

Example numbers (5), (6) and (7), on their face, are allegations of sex discrimination, not national origin discrimination.[61]   Nevertheless, considering all the alleged examples, with the Report and Rounds' testimony, the court concludes that these alleged actions of Defendant, even if they occurred, are not sufficiently connected or systematic such that a reasonable fact finder could conclude that they were part of an overarching practice or policy in place, and designed to, frustrate the efforts of prospective loan applicants in the Virgin Islands solely because they are Virgin Islanders.  In fact, concerning examples (6) and (7), it is stated in the Prejean Greaux On-Site Review that although "There were comments from at least two persons attending the town meeting indicating that they were told by a past Rural Development manager to 'get married' or to 'have a child,' in order to become eligible for a housing loan. . . .  [t]here was no evidence of a trend in which applicants are routinely advised in this manner."  (On-Site Review 7836.)  Having reviewed the record, the court concludes the incidents that the Plaintiffs' complaint are of isolated instances and do not fall into a pattern or practice by Defendant.[62]  In addition, none of these isolated instances, standing alone, illustrates animus or hostility against Virgin Islanders as

---

[61] The court notes again the Plaintiffs have chosen to proceed with their claims that discrimination was based on national origin.  The court will not consider allegations of sex discrimination as evidence of national origin discrimination, as such would be inconsistent with Chiang II.

[62] Further, to the extent that any of those individual instances occurred prior to June 1997, there is no temporal connection between the actions and the "reign" of the Florida State Office, despite Plaintiffs' argument that it was the Florida State Office that was responsible for the development and implementation of the "impossible yes."  However, even if these incidents occurred after Florida assumed management of the Virgin Islands RD programs, they are still individual and isolated.

a group.[63]  Thus, Plaintiffs have not met their burden of establishing an inference of national

origin discrimination.  See, e.g., Teamsters, 431 U.S. at 336.

>    iv.    Plaintiffs' evidence is not sufficient to establish that discrimination
>            was the Defendant's standard operating procedure in its
>            administration of its RD loan programs to Virgin Islanders who
>            had received a loan application but who had not yet received a
>            loan.

Plaintiffs themselves acknowledge the lack of connections among the adverse actions

alleged to comprise the "impossible yes."  In Plaintiffs' Post-Oral Argument Supplemental Brief,

they state that:

>    The Court's comments regarding the scope of the class are well-
>    taken.  When this action was initially filed and class certification
>    obtained, it seemed natural to treat the entire "Highway to
>    Nowhere" pattern and practice as a class issue, in conformity with
>    the findings in the Civil Right Compliance Review report.  But
>    discovery has revealed what the Court has also discerned, which is
>    that the "impossible yes" portion of the pattern and practice may
>    contain too many different acts and require proof of two many
>    individual facts to be very susceptible to class treatment.

(Pls.' Post-Oral Arg. Suppl. Brief 2-3.)  Plaintiffs then offered to stipulate, at odds with the

position at argument, to a modification of the class in some way that would be related to conduct,

not persons:

>    1.    The conduct of refusing to give out loan applications to
>            Virgin Islanders and the use of the so-called "waiting list"
>            as a device employed to effect the refusal of applications;
>            and

---

[63] The court is not stating that Plaintiffs must prove animus or hostility toward a protected class in order to establish an inference of national origin discrimination, but is pointing out the absence of evidence of such animus in these isolated instances which do not appear to constitute part of a larger pattern and practice.

> 2. That the national origin designation of Virgin Islander be separated from the concept of the class certified for recovery purposes, such that Virgin Islander national origin is limited to people of West Indian descent whose permanent residence was in the Virgin Islands at the time they attempted to apply for a loan.

(Id. 3.)

Defendant made no response and Plaintiffs filed no motion, and therefore the proposed stipulation is of no legal significance.  Despite the language of the proposed stipulation, the court is left with the consistent point in oral argument and Plaintiffs' Post-Oral Argument Supplemental Brief which states:

> Certainly, defendant offered zero evidence that the USDA officials in Vermont or the Virgin Islands perceived any of the class members as not being Virgin Islanders.  To the contrary, all inferences and evidence is to the effect that they perceived all class members as a contiguous whole known to defendant as "Virgin Islanders." . . . Plaintiffs submit that it would have been impossible for defendant's officials (or this Court) to perceive "ethnic distinctions" or different national origins among the plaintiffs and class members present in the courtroom during oral argument, or in the 600 other class members who were waiting outside the courtroom – or, for that matter, the 2,300 people on the so-called "waiting list" for loan applications.  As far as defendant was concerned, they were all Virgin Islanders.

(Id. 4-5.)  Therefore, the court now proceeds to consider the class as it was reformed by the Third Circuit in Chiang II.

Second, considering the evidence in a light most favorable to Plaintiffs, even if these events occurred and Defendant erred in its eligibility calculation and incorrectly told individuals that their plans were not approved, etc., there is absolutely nothing from which the court can tease out an inference of class-based national origin discrimination.  The testimony of Rounds

and Morris, the Report, and the anecdotal testimony are not sufficient to establish national origin discriminatory intent.  Plaintiffs' evidence as presented to the court and argued in the briefing, is, at best, of incompetence and/or mistake in some of Defendant's dealings with <u>individuals</u>, not intentional national origin discrimination on a systemic level, rising to the level of a pattern, practice or policy.

A finding that there is no proof of a pattern or practice of national origin discrimination with respect to Defendant's actions between the issuance of a loan application and prior to the funding of a loan does not preclude the possibility that individual claims of disparate treatment could be pressed whether discrimination is believed to have occurred because of national origin, or other protected status.  However, whether there is a legal basis for individual claims of discrimination under ECOA is not decided here.

**E.**     **ECOA Count III: Acts Occurring At or Subsequent to Funding of a Loan**

In Count III, Plaintiffs focus on an alleged practice of discrimination by Defendant occurring at or subsequent to the funding of a loan.  Plaintiffs allege that Defendant discouraged Plaintiffs by refusing to address and resolve dwelling structural complaints and issues.  Plaintiffs allege that after being subjected to the illegal waiting list and the "impossible yes" scheme of Defendant, they received some loan assistance from Defendant and that:

> Upon and/or after approval and funding of the loans and programs that Plaintiffs, and each of them, had applied for, the unlawful discrimination continued against Plaintiffs as described hereinbelow.  The wrongs include, but are not limited to, failure to properly fund loans, participation in and ratification of the construction of substandard and defective housing, failure to investigate complaints of construction defect, failure to correct

> defects, harassment and attempts to divest Plaintiffs, and each of
> them, of their housing and all payments made therefore.

(First Amend. Compl. ¶ 141.)

The court incorporates its holding above that Section 741 is not applicable to the facts of this case.  Further, as determined in the discussion of Count II, the court finds that Plaintiffs have produced no evidence that any allegedly discriminatory acts, cognizable under ECOA and constituting a pattern and practice of discrimination, occurred during the limitations period. Plaintiffs' Count III is therefore untimely, and the court must grant Defendant's Motion for Summary Judgment for that reason.

Assuming, _arguendo_, that the court could find there to be a genuine issue of material fact as to the timeliness of Count III, the court will proceed to examine Defendant's argument that summary judgment should be granted on the merits because Plaintiffs have failed to produce evidence to raise a genuine issue of material fact that discrimination was Defendant's standard procedure at, or subsequent to, the funding of an RD housing loan.  Plaintiffs allege that Defendant took various actions against individual Plaintiffs, which Plaintiffs allege are typical of Defendant's actions against class members who sought housing services and credit assistance through RD programs.  (First Amend. Compl. ¶¶ 144-165.)  These allegations generally fit into the following categories:

(1)      Homes built with RD funding were built with construction defects, about which Defendant had knowledge.  Individuals complained to RD about the defect when they gained knowledge, and Defendant failed to investigate or resolve the complaint.  (See, e.g., id. ¶¶ 144-47.)

(2)     Defendant refused to provide construction loans for properties chosen by individuals but steered individuals to inferior pieces of property and only approved loans based on an individual's selection of such inferior pieces of property.  (See, e.g., id. ¶ 150.)

(3)     Defendant oversaw construction that it knew to be defective and took no remedial actions.  (See, e.g., id. ¶ 154.)

Plaintiffs' evidence and arguments in support of its claim of discrimination under Count III are sparse and appear from the briefing to be largely the same type of individualized claims as those made with respect to Count II.  The court has considered the record in its entirety and concludes that Plaintiffs have not produced sufficient evidence to raise a genuine issue of material fact that there existed a pattern and practice of national origin discrimination in RD's administration of housing loans during the time at, or subsequent to, the funding of loans.  The evidence, taken in a light most favorable to Plaintiffs, establishes, at best, the occurrence of several isolated adverse actions, from which no reasonable fact-finder could find or infer discriminatory intent or even a pattern of action.  Plaintiffs have failed to meet their burden of proof that discrimination was the standard practice of Defendant in administering the housing loans that it approved in the Virgin Islands.  As the Plaintiffs have not met their burden to establish a prima facie case of discrimination, the burden does not shift to Defendant.

As a result, the court grants Defendant's Motion for Summary Judgment on Count III of the First Amended Complaint.

**F.      FHA Claim & APA Claim**

Defendant also seeks summary judgment on non-class claims brought by Plaintiffs under the Fair Housing Act (FHA) and the Administrative Procedure Act (APA), at Counts IV and V respectively.

Individual plaintiffs Jacqueline Carr and Velsina George bring Count IV of the First Amended Complaint against Defendant, alleging a violation of the FHA, 42 U.S.C. §§ 3601 et seq.  Count IV is not a class claim.  It is alleged that Defendant discriminated against Plaintiffs Carr and George in the financing, construction and sale of homes at the Estate St. George Villas housing development in St. Croix by selling them homes that Defendant knew did not comport with Defendant's program guidelines and by denying Carr and George access to Defendant's construction defect grant program.  Plaintiffs Carr and George allege that "[a]t the time of making the loans, defendant knew of the defects and knew additional expenditures would be required, and knew that plaintiffs could not afford them.  Yet, defendant forced plaintiffs into these houses, with these loans, requiring additional expenditures, and then refused them access to the defect grant program."  (Pls.' Opp. Def.'s Mot. Summ. J. 68.)  The gravaman of the FHA claim is that Defendant denied Plaintiffs Carr and George access to Defendant's construction grant program.

In Count V of their First Amended Complaint, Plaintiffs argue that Defendant violated the APA, 5 U.S.C. §§ 701, by denying credit, engaging in the "impossible yes" scheme and systematically failing to process properly their civil rights claims of discrimination on the basis of national origin.  (See First Amend. Compl. ¶ 174.)  This count is brought by all plaintiffs against Defendant, however, the parties agree that Count V has not been certified for class

treatment.

Plaintiffs have filed an opposition to the entry of summary judgment on Counts IV and V, and have also filed a motion under Fed. R. Civ. P. 56(f) requesting that this court withhold decision on summary judgment until additional discovery is completed.

1.    Defendant's Motion for Summary Judgment and Plaintiffs' Motion pursuant to 56(f) for denial or continuance of summary judgment.

In their 56(f) motion, Plaintiffs contend that adequate discovery had not been conducted to enable Plaintiffs to oppose Defendant's motion for summary judgment on Counts IV and V. Plaintiffs argue that because little to no discovery has been conducted on matters unrelated to the class issues, summary judgment should be denied to allow discovery.[64]  The court will first address this 56(f) motion.

Rule 56(c), under which Defendant moves for summary judgment, permits a defending party to move for summary judgment "at any time."  Rule 56(f), provides that:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition [to the motion for summary judgment], the court may:
>
> (1)    deny the motion;
> (2)    order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> (3)    issue any other just order.

Fed. R. Civ. P. 56(f).  The Third Circuit has interpreted Rule 56(f) "as imposing a requirement that a party seeking further discovery in response to a summary judgment motion submit an

---

[64] Plaintiffs aver that the Magistrate Judge managing the case previously ordered that the trial of this case would be divided into at least two phases, the first phase being limited to the "class issues," which exclude Counts IV and V.

affidavit specifying, for example, what particular information is sought; how, if uncovered it would preclude summary judgment; and why it has not previously been obtained."  Dowling v. City of Philadelphia, 855 F.2d 136, 139-140 (3d Cir. 1988).

Counsel for Plaintiffs, Douglas B. Inman, Esq., has submitted an affidavit, as required, with the 56(f) motion.  The affidavit states that upon the request of defense counsel, the magistrate judge limited Phase I of the trial to class-certified issues.  (Inman Aff. ¶ 6.)  Attorney Inman further states that there has been no, or limited, discovery on non-class issues and that for those reasons, Plaintiffs are unable to oppose summary judgment on any issues other than the class claims concerning the "waiting list and associated devices."  (Inman Aff. ¶¶ 8-9.)  Solely, on that basis, Plaintiffs seek denial of Defendant's motion for summary judgment until discovery on issues relating to non-class claims is conducted.  (Inman Aff. ¶ 10.)  In the affidavit, Attorney Inman states that Defendant's motion for summary judgment is fact-specific and that "the information needed to respond adequately is in defendant's possession."  (Inman Aff. ¶ 11.)

### 2.   FHA Claim

The first question before the court is whether to grant Plaintiffs' Rule 56(f) motion to deny summary judgment on the FHA claim to await further discovery on the FHA claim.

In their Post-Oral Argument Supplemental Brief, Plaintiffs state that "In the event that the Court finds summary judgment is properly now considered as to Count IV, which was not certified for class treatment and upon which discovery has not been conducted under Phase I of the class-certified issues, and thereon denies plaintiffs' Fed. R. Civ. P. 56(f) motion in that regard, plaintiffs will agree to dismissal of Count IV."  (Pls.' Post-Oral Arg. Suppl. Brief 1.)

To determine whether consideration of summary judgment is appropriate at this point, the court must analyze Plaintiffs' FHA claims to determine whether there are material facts that remain discoverable as to any dispositive issues.

Defendant offers several arguments in support of its motion for summary judgment on the FHA claim, including that the claim is not timely.  Defendant contends that the issue of timeliness can be decided by this court, as a matter of law, and that, consequently, Defendant's motion for summary judgment is ripe for this court's review.  The court will address first the issue of timeliness, and then move on to Defendant's other arguments for summary judgment, if necessary.

It is undisputed that the FHA requires that claims brought thereunder be brought "not later than 2 years after the occurrence or termination or an alleged discriminatory housing practice."  42 U.S.C. § 3613(a)(1)(A).  The original complaint in this matter was filed on January 11, 2000, which would make the statute of limitations period January 11, 1998 through January 11, 2000.  Defendant argues that the FHA claim is not timely because (1) Plaintiffs Carr and George have not alleged the occurrence of any actionable misconduct during the statute of limitations period, and (2) the continuing violation doctrine applies only to affirmative actions of alleged misconduct, not the continued effects of such alleged misconduct.

Plaintiffs concede that Defendant "may have a valid argument with regard to statute of limitations" for the FHA claim.  (Pls.' Opp. Def.'s Mot. Summ. J. 70.)  Plaintiffs seek, however, the opportunity to conduct discovery on the issue of statute of limitations, including the continuing violation theory.  (Id.)  Specifically, Plaintiffs seek relief under Rule 56(f) "to conduct discovery . . . on actions taken by the defendant that continued to occur after, between 1992 and

1997."  (Oral Arg. Tr. 86, May 25, 2007.)

Rule 56(f) "requires that a party indicate to the district court its need for discovery, what material facts it hopes to uncover and why it has not previously discovered the information." Radich v. Goode, 886 F.2d 1391, 1393-94 (3d Cir. 1989).  In the 56(f) affidavit, Plaintiffs' counsel states that discovery is necessary on the issue of the "timing" of events.  Counsel also states that additional discovery is necessary to determine whether "there are existing applications for the [construction] defect grant program filed in the V.I. either by plaintiffs or others" and that "[w]itnesses to plaintiffs' efforts to access the program must be deposed for procedure and actual occurrences in the V.I. and elsewhere."  (Inman Aff. ¶ 11.)  The court must determine whether Plaintiffs have met their burden and established that there exist material facts to be discovered that would raise a genuine issue of material fact as the timeliness of the FHA claim and the applicability of the continuing violation.

The general time line of Plaintiffs allegations under the FHA claim is undisputed. Plaintiffs Carr and George's claim relates to homes that were built in the Estate of St. George development in St. Croix.

It is undisputed that Carr's section 502 loan through Defendant closed in December 1991 and she moved into her home in January 1992.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 58, Carr Dep. 52, April 12, 2005.)  Carr noticed defects in her home approximately one month after moving in, and immediately complained to Defendant.  (Id. 36.)  Carr did not receive any relief from RD, which only directed her to the builder.  (Id. 36-37.)  The builder did not provide assistance.  (Id.)  Carr complained to RD several times over the years through the first half of July 1997, when she and George made oral complaints at a community meeting at which at least

one USDA official was present.  (Id. 87, 91-92)  Carr has no recollection of ever submitting a complaint to the Defendant in writing.  (Id. 99.)

Construction on George's home finished in September 1991.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 62, George Dep. 26, April 25, 2006.)  Immediately after moving in, George discovered defects in the plumbing and electricity, as well as in the overall construction of the house.  (Id. 29-31.)  George contacted RD about the problems by February 1992.  (Id. 34.)  George did not receive relief from RD.  (Id. 31-34.)  She also contacted the builder, and did not receive relief.  (Id. 31-32.)  The builder told George to contact RD and vice versa.  (Id. 33.)  George continued to complain to the Defendant in the years that followed.  (Id. 35-37.)

Although Plaintiffs' allegations under the FHA claim could be pled with significantly greater clarity, the court has discerned the following alleged misconduct from the pleadings, oral argument, and the affidavit accompanying the Rule 56(f) motion: (1) Plaintiffs were steered to construct on certain sites using certain builders; (2) Plaintiffs had no access to the homes during construction; (3) misrepresentations were made to Plaintiffs  concerning the homes prior to the closing of the loans; (4) Defendant closed on the loans for the homes despite having knowledge that the homes were not livable and that additional expenditures by the homeowners would be necessary; (5) Plaintiffs discovered structural defects in the homes, which the contractors failed to remedy; (6) Defendant failed to remedy the defects and denied Plaintiffs access to its construction defect loan program.  (See, e.g., Inman Aff. ¶ 12.)  By their Response in Opposition to Defendant's Motion for Summary Judgment and their Rule 56(f) motion, Plaintiffs argue that Defendant engaged in a course of misconduct in refusing to remedy the structural defects in Plaintiffs' homes and denying Plaintiffs access to the construction defect grant program.

The undisputed time line, however, reveals that all alleged actions, choice of construction site, lack of access to the homes during construction, representations made during the loan application and construction of the homes, the closing of the loans, the inspections of the homes, as well as the Plaintiffs' moves into their homes, their subsequent discoveries of structural defects and their initial requests to the Defendant to remedy those defects, occurred in 1991-1992, or shortly thereafter, long before the statute of limitations period.  The only misconduct alleged to occur after 1992 is the persistence of structural defects and the failure of Defendant to remedy those defects.  Defendant argues, in effect, that Plaintiffs seek relief for the continued effects of Defendant's alleged misconduct, and that the continuing violation doctrine is inapplicable to such continued effects, and that there are no outstanding discoverable material facts on the issue of timeliness and the continuing violation doctrine.

"The continuing violations doctrine is an 'equitable exception to the timely filing requirement.'" Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (quoting West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995)).  The continuing violation doctrine is applicable in actions brought under the FHA.  Community Interactions-Bucks County, Inc. v. Twp. of Bensalem, No. CIV. A. 93-3959, 1994 WL 276476, at *5 (E.D. Pa. June 22, 1994) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 381 (1982)).  If the conduct of a defendant is "part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991).

In determining whether the continuing violations doctrine applies, the court must

determine whether the conduct of the defendant is "more than the occurrence of isolated or

sporadic acts." Cowell, 263 F.3d at 292 (quoting West, 45 F.3d at 755.)  The Third Circuit has

outlined three factors for courts to consider in making this determination:

> (1) subject matter - whether the violations constitute the same type
> of discrimination, tending to connect them in a continuing
> violation; (2) frequency - whether the acts are recurring or more in
> the nature of isolated incidents; and (3) degree of permanence -
> whether the act had a degree of permanence which should trigger
> the plaintiff's awareness of and duty to assert his/her rights and
> whether the consequences of the act would continue even in the
> absence of a continuing intent to discriminate.

Cowell, 263 F.3d at 292 (internal quotes and citation omitted).  The third factor is considered to

be the most important.  Id.  These factors distinguish between the "consequences of the act" and

the "act" itself.  It is imperative to recognize this distinction because it is well-established that the

"focus of the continuing violations doctrine is on affirmative acts of the defendants." Cowell,

263 F.3d at 293 (citing Delaware State College v. Ricks, 449 U.S. 250, 258 (1980); Sameric

Corp. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998); 287 Corporate Center Assoc. v.

Twp. of Bridgewater, 101 F.3d 320, 324 (3d Cir. 1996)).  "[A] continuing violation is occasioned

by continual unlawful acts, not by continual ill effects from an original violation." Community

Interactions-Bucks County, Inc., 1994 WL 276476, at *5-6 (in which plaintiffs' "allegations set

forth a paradigmatic case of continual ill effects – never having received the permits – from an

original violation – the Township's denying or refusing to issue the permits.") (quoting Ward v.

Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981), cited with approval in Sandutch v. Muroski, 684

F.2d 252, 254 (3d Cir. 1982)); see also Cowell, 263 F.3d at 293 (holding that the existence of

liens previously imposed and the refusal to remove those liens were not affirmative acts of a

continuing violation); <u>Meyers v. Pennypack Woods Home Ownership Ass'n</u>, 559 F.2d 894, 899 (3d Cir. 1977) (noting distinction in acts constituting a continuing violation in class actions alleging patterns and practices of discrimination and cases involving individual plaintiffs); <u>see also</u> <u>Fair Hous. Council, Inc. v. Vill. Of Olde St. Andrews, Inc.</u>, No. 05-5862, 2006 WL 3724128, at *11-12 (6th Cir. Dec. 15, 2006) (stating that in Fair Housing Act cases alleging housing discrimination in the rental or sale of housing units, the discriminatory act is complete at the time a unit has been sold or rented).

The court finds that the continued existence of construction defects and Defendant's continued refusal to remedy those defects, through its construction defect grant program or any other program that it administers, are not the affirmative acts of a continuing violation.[65]  Such alleged conditions, refusal, and inaction are continual ill-effects of the alleged acts occurring in and around 1992: the "steering" of Plaintiffs Carr and George to certain contractors and building sites, the construction of homes with defects, and the refusal to remedy those defects by any means, including the construction defect grant program.  Having made these findings, the court turns to Plaintiffs' 56(f) motion and the accompanying affidavit to determine whether Plaintiffs have sufficiently identified what discoverable material facts they hope to uncover in discovery to allow them to adequately oppose Defendant's motion for summary judgment on the issue of timeliness.

---

[65] It appears to be Plaintiffs' argument that, because Defendant has never remedied the construction defects in Plaintiffs' Carr and George's homes, and has never given them "access" to the construction defect grant program, there is a continuing violation to this day.  Should Defendant never remedy the construction defects of these homes, built over 17 years ago, Plaintiffs Carr and George would hypothetically be able to bring this action at any point of time, and this court believes, as other courts have found, that Congress did not intend such a result. <u>See, e.g.</u>, <u>Community Interactions-Bucks County, Inc.</u>, 1994 WL 276476 at *6.

First, Plaintiffs' claim to require further discovery on the "timing" of events is vague and does not specify what facts they hope to uncover through additional discovery and why such facts are material to the issue of the statute of limitations, as is required to succeed on a 56(f) motion. See Radich, 886 F.2d at 1393-94.  Second, counsel's representation that further discovery is necessary regarding Plaintiffs' efforts to access the construction grant defect program and on the issue of continuing violations is not sufficient cause for grant of the Rule 56(f) motion because the continuing violation theory is not applicable to the types of acts Plaintiffs overtly and implicitly allege occurred after 1992.  The court cannot conceive of any discoverable material facts that would be relevant to timeliness that have not yet been discovered, and Plaintiffs do not specify any such material facts in their Rule 56(f) motion and affidavit.  As the continuing violation theory is legally inapplicable to this conduct, no amount of discovery can raise a genuine issue of material fact that the continuing violation doctrine is applicable and that Plaintiffs' FHA claim is timely.

Consequently, the court finds that summary judgment on the FHA claim, specifically on the issue of timeliness, is presently ripe for review, and Plaintiffs' Rule 56(f) motion is denied as a result.[66]  Having denied Plaintiffs' Rule 56(f), the court dismisses Plaintiffs' FHA claim,

---

[66] In addition to Defendant's argument that the FHA claim is not timely, it offers several other arguments in support of its Motion for Summary Judgment, including that (1) Congress has barred judicial review of any claim premised upon Defendant's administration of its construction defect regulations; (2) Plaintiffs' claim does not fall within the cause of action established by Congress for FHA claims asserted against the Government; and (3) the claim is not cognizable under the FHA.  Each of these basis is a question of law that is presently ripe for review on summary judgment, as additional discovery would be futile.  Since Plaintiffs have not, and cannot identify any material facts to be discovered that would enable it to fully oppose the Defendant's Motion for Summary Judgment on these arguments, even if the court had found it appropriate to permit Plaintiffs to take more discovery as to the issue of timeliness (including the continuing violation theory), the court would have still found the matter ripe for summary

pursuant to Plaintiffs' agreement to dismissal in its Post-Oral Argument Supplemental Brief. Even if Plaintiffs had not agreed to dismissal, the court would grant Defendant's motion for summary judgment on the FHA claim because Plaintiffs have not raised a genuine issue of material fact that this claim is timely.

3.    APA Claim

Plaintiffs also request, pursuant to Fed. R. Civ. P. 56(f), that this court refrain from ruling on Defendant's Motion for Summary Judgment on Count V, the APA claim, for the reason that discovery has not yet been conducted on the non-class counts.  In their Post-Oral Argument Supplemental Brief, however, Plaintiffs stated that "[t]o the extent that the Court denies plaintiffs' 56(f) motion and finds that the APA claims in Count V are ripe for summary judgment, plaintiffs will not resist dismissal."[67]  (Pls.' Post-Oral Arg. Suppl. Brief 2.)

The court must now decide whether to grant Plaintiffs' motion under Rule 56(f) to withhold decision on the motion for summary in order to allow further discovery to take place on issues relating to the APA claim.  If the court denies the 56(f) motion, Plaintiffs agree to the

---

judgment.  Because of Plaintiffs' agreement to dismiss the FHA claim if the court found the claim ripe for review on summary judgment, the FHA claim would still be dismissed.

[67] As a condition to their agreement to dismissal, Plaintiffs state that "should the Court subsequently find that acts of wrongdoing alleged under the ECOA counts are not 'aspects of a credit transaction' such that the ECOA does not provide a remedy for said acts, plaintiffs request the opportunity to amend and re-plead the APA count since at that time the APA would be an appropriate vehicle for injunctive and equitable relief." (Pls.' Post-Oral Arg. Suppl. Brief 2.) Although, in addition to finding that the allegation that Defendant failed to investigate was not cognizable under ECOA, the court found that the failure of Defendant to provide compensation to plaintiff Rawlins for construction defects was not cognizable under ECOA.  It is not appropriate to grant Plaintiffs' leave to amend and re-plead the APA count on this basis alone, nor does this change Plaintiffs' conditional agreement to dismissal.

dismissal of the APA count.  Defendant argues that its motion for summary judgment on the APA claim is ripe for review because it can be decided as a matter of law.  If the motion for summary judgment can be decided as a matter of law, the court will deny the 56(f) motion, and dismiss the APA claim, as Plaintiffs have agreed.

The court incorporates its discussion of Rule 56(f) above.  As Count V is pled, it argues that Defendant violated the APA by denying credit (through measures including the use of an application waiting list), engaging in the "impossible yes" scheme and systematically failing to process properly individuals' civil rights claims of discrimination, and that these actions were taken because of Plaintiffs' national origin as Virgin Islanders.  During the January 25, 2002 motions hearing on Defendant's Motion to Dismiss, District Judge Moore ruled that "[the APA claim] doesn't apply to counts of discrimination in the credit transaction that would be cognizable under ECOA" and restricted the APA claim to the "non-credit related claims." (Def.'s Mem. Supp. Mot. Summ. J. Ex. 1, Oral Arg. Tr. 61, Jan. 25, 2002.)  Plaintiffs acknowledge that they brought the APA claim, in part, as an alternative theory of liability in the event that this court finds that any of the allegedly discriminatory actions pled to constitute a pattern and practice of discrimination in the ECOA counts (Counts I through III) are not a "credit transaction" under ECOA, 15 U.S.C. § 1691(a).  The court only made such a finding with respect to Defendant's alleged failure to investigation discrimination claims.[68]  Therefore, the only

---

[68] Further, at oral arguments on the cross motions for summary judgment, counsel for Defendant stated that "both parties agree that with respect to plaintiffs' claim of credit discrimination, those claims are fully redressable by ECOA, and therefore there are no, there's no APA cause of action for those claims."  (Oral Arg. Tr. 33, May 25, 2007.)  Although the court did determine that Defendant's alleged failure to remedy plaintiff Rawlins' construction defects was not cognizable under ECOA, it appears clear from Plaintiffs' arguments that this is not the type of conduct for which Plaintiffs' seek relief under the APA.  Should Plaintiffs have intended

alleged action of Defendant for which Plaintiffs seek relief under the APA is the failure to
investigate discrimination complaints.

Defendant argues that question of whether failure to investigate discrimination
complaints is actionable under the APA is a purely legal issue.  During oral argument, Plaintiffs'
counsel conceded that "[the court] certainly can rule as a matter of law whether or not the failure
to investigate complaints is cognizable under the APA."  (Oral Arg. Tr. 87, May 25, 2007.)
Therefore, it is undisputed that the issue on summary judgment is purely legal and is ripe for
review at this stage, despite the minimal discovery that Plaintiffs claim to have had the
opportunity to take on the APA claim.[69]  Although Plaintiffs have submitted an affidavit along
with their 56(f) motion, they point to no material facts that they seek to uncover through
discovery on the issue of whether the failure to investigate complaints is cognizable under the
APA.  It is a purely legal question.  Discovery would be futile.  The court denies Plaintiffs' 56(f)
motion.

Having found that Defendant's motion for summary judgment on Count V is ripe, the
court turns its attention to Plaintiffs' consent to the granting of the summary judgment on this
count.  As a result of this consent, the court is not required to determine whether the failure to

---

to include this conduct in the allegations of Count V, the court determines that Plaintiffs have not
met their Rule 56(f) burden, and that Defendant's Motion for Summary Judgment on the APA
claim is therefore ripe with respect to this narrow issue of construction defects.

[69] Accompanying Plaintiffs' Rule 56(f) motion is an affidavit from Plaintiffs' counsel
detailing the discovery necessary to oppose Defendant's Motion for Summary Judgment.  The
issues on which Plaintiffs appear to seek additional discovery on this count revolve around the
timeliness of the APA complaint.  As the court has noted, since the threshold issue of whether
Plaintiffs' claim is cognizable is purely legal in nature, any additional discovery would be futile
as there are no relevant discoverable material facts.

investigate discrimination complaints is cognizable under the APA.

Having denied Plaintiffs' 56(f) motion, and upon consent of the Plaintiffs as articulated in their Post-Oral Argument Supplemental Brief, the court grants Defendant's Motion for Summary Judgment on the APA claim, Count V, in full.

### G.   Equal Protection Claim

In Count VI of the First Amended Complaint, Plaintiffs allege a violation of the Equal Protection Clause of the United States Constitution.  (First Amend. Compl. ¶¶ 179-189.) Defendant does not seek summary judgment on this count because this count is no longer active in this case.  During a record hearing held on January 25, 2002, concerning Defendant's Motion to Dismiss, District Judge Moore ruled Plaintiffs were required to amend Count VI to provide a more definite statement of the claim.  (Oral Arg. Tr. 60-62, January 25, 2002)  Plaintiffs did not amend Count VI, and, in exercising their choice not to, they have effectively withdrawn this count.  Plaintiffs do not dispute this procedural posture in their present arguments.  Accordingly, the court concludes that Count VI was withdrawn by Plaintiffs when they elected not to amend it in accordance with Judge Moore's ruling.

### V.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment and Defendant's Motion to Define Virgin Islander are denied, and Defendant's Motion for Summary Judgment is granted.  An appropriate order follows.